Gary KOPFF et al., Petitioners,

v.

DISTRICT OF COLUMBIA ALCOHOLIC
BEVERAGE CONTROL BOARD et
al., Respondents,

C. J. K., Incorporated, Intervenor.

No. 11374.

District of Columbia Court of Appeals.

Argued Sept. 23, 1977.

Decided Dec. 30, 1977.

Rehearing Denied March 6, 1978.

Sari B. Marmur, with whom Jason Newman and Johnny Barnes were on the briefs, for petitioners.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent District of Columbia Alcoholic Beverage Control Board.

J. E. Bindeman, Washington, D. C., with whom Leonard W. Burka and Stuart L. Bindeman, Washington, D. C., were on the brief, for intervenor.

Before KELLY, NEBEKER, and FERREN, Associate Judges.

FERREN, Associate Judge:

We are presented with a petition to review the issuance of a "Class C" liquor

license by the Alcoholic Beverage Control Board ("ABC Board") to the intervenor, C.J.K., Inc. ("C.J.K."). Many of the questions presented involve commonly alleged procedural irregularities; the central issue, however, is a matter of first impression—the role of the recently created Advisory Neighborhood Commissions ("ANCs") in ABC Board hearings. For reasons elaborated below, we remand this proceeding to the ABC Board for a new hearing, in order to cure defects in the notice of the hearing on original issuance of the license, and to assure that the Board gives "great weight" to the "issues and concerns" of the ANC, as required by statute. We do not, however, order revocation of C.J.K.'s license; it shall remain in effect pending the outcome of the next hearing.

Our discussion proceeds as follows: Part I describes the ABC Board proceedings at issue. Part II considers the capacity of ANCs to petition for judicial review, the standing of area residents to assert violations of ANC rights, and the alleged mootness of the present petition. Part III covers questions about notice—the failure of the ABC Board to give "special notice" to affected ANCs, to give personal notice to known remonstrants, and to post notice on C.J.K.'s premises. Part IV addresses questions about the Board's obligation to give "great weight" to the "issues and concerns" of affected ANCs. Part V deals with the Board's evidentiary rulings, particularly the exclusion of an ANC resolution, of a neighborhood survey of residents' views, and of certain data respecting the impact of a Metro station under construction nearby. Fi-

nally, Part VI discusses the adequacy of the ABC Board's findings and conclusions.

## I. *ABC Board Proceedings*

The intervenor, C.J.K., intending to operate an Irish family restaurant, applied on April 22, 1976, for a Class C liquor license for the premises located at 3412 Connecticut Avenue, N.W.[1] As required by statute, D.C.Code 1973, § 25–115(b), the ABC Board posted and published notice of the date for hearing on the application, May 20, 1976. Two neighborhood residents, Judy and Gary Kopff, are among the petitioners here.[2] They collected the signatures of thirty-eight remonstrants on a petition opposing the grant of the license, and submitted the petition to the Board.[3]

For reasons apparently connected with the substantial protest, the ABC Board re-scheduled the hearing for June 9, 1976. The Board published notice of the rescheduling, as required, and also personally notified Judy Kopff; but the Board did not notify other known remonstrants or post notice of the new date on the premises. After conducting a contested hearing on June 9, 1976, during which nine individuals testified for the applicant and four remonstrants testified against, the Board determined, by findings of fact and conclusions of law, that the location was "appropriate for the license desired." On September 21, 1976, the Board ordered that the license be issued "upon compliance by the applicant with all remaining requirements of this and other appropriate municipal agencies." C.J.K. complied, and the license eventually was issued on January 14, 1977.[4] In the

---

**1.** D.C.Code 1973, § 25–111(g), provides for issuance of a "Retailer's License, class C . . only for a bona fide restaurant, hotel, or club . . . . [which license] shall authorize the holder thereof to keep for sale and to sell spirits, wine, and beer at the place therein described for consumption only in said place. . . ."

**2.** Petitioners include: Gary Kopff and Judy Kopff; Advisory Neighborhood Commissions 3–C and 3–F; ANC 3–C Commissioners Neal Krucoff, Kay McGrath, Lindsley Williams, Katherine Coram, Charles Vanway, Jr., Sam Smith, Thomas Corcoran, Jr., and Ruth Houg-

en; ANC 3–F Commissioners Stephen P. Belcher, Jacob D. Kolper, Mark Novitch, Barry Zamoff, and Mitchell H. Sindler. The Commissioners petition both in their official capacities and as individuals.

**3.** The notice statute, D.C.Code 1973, § 25–115(b), uses the term "remonstrants" to describe those who oppose issuance of a liquor license.

**4.** By force of D.C.Code 1973, § 25–114, this license expired 17 days later on January 31, 1977. Meanwhile, on December 20, 1976, C.J.K. had applied for "renewal" for the new

meantime, this petition for judicial review had been filed on October 6, 1976. *See* D.C.Code 1977 Supp., § 1510; D.C.App.R. 15.

## II. *ANC Capacity to Petition for Judicial Review; Alleged Mootness of the Petition*

The ABC Board and C.J.K. have raised two potential barriers to this court's resolving the issues raised by the petitioners. First, they contend that the ANCs and the ANC Commissioners ought to be dismissed as parties to this proceeding because D.C. Code 1977 Supp., § 1–171i(g) precludes ANCs from initiating court actions. Second, they maintain that the expiration of the 1976–77 license and unprotested issuance of a 1977–78 license to C.J.K. have mooted the petition. Before considering the merits of petitioners' arguments, therefore, we must resolve these two issues.

### A. *Capacity to Initiate Legal Action*

█ The Duties and Responsibilities of the Advisory Neighborhood Commissions Act of 1975, D.C.Law 1–58, March 26, 1976, now codified in D.C.Code 1977 Supp., § 1–171a *et seq.* (the "ANC Act"), contains a specific prohibition against initiation of legal actions by ANCs. The pertinent subsection states:

> The Commission shall not have the power to initiate a legal action in the Courts of the District of Columbia or in the Federal courts, provided that this limitation does not apply to or prohibit any Commission from bringing suit as a citizen.[5] The Commission may petition the Council through the Special Committee on Advisory Neighborhood Commissions or such successor committee should the Commission feel legal redress is required. [D.C.Code 1977 Supp., § 1–171i(g).]

license year, February 1, 1977, to January 31, 1978. On January 25, 1977, that application was granted after the posting of notice as required by law. D.C.Code 1973, § 25–115(b). Notice by publication is not required for renewals. *Id.* The renewed license is currently in effect.

The ABC Board and C.J.K. maintain that this language forbids the ANCs and ANC Commissioners to file the present petition.

Petitioners counter by arguing that the petition for review is not an "initiation" of legal action within the meaning of § 1–171i(g); they say it is a secondary, follow-up step in a process initiated by C.J.K.'s filing of a liquor license application and the ABC Board's holding of an administrative hearing. In support of this contention, petitioners assert that the statutory purpose behind the institution of ANCs—*i. e.,* the creation of "grass roots" organizations capable of identifying and communicating local opinions to legislative and administrative officials—will be defeated if ANCs are not able to seek judicial vindication of their statutory rights when administrative agencies ignore them. As further support for their interpretation, petitioners note that judicial review of administrative determinations is favored; thus, any legislative intention to abridge such review must be shown by clear and convincing evidence. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). Petitioners can perceive no intention in § 1–171i(g) to deny ANCs the generous review provisions of the District of Columbia Administrative Procedure Act (the "DCAPA"). D.C.Code 1977 Supp., § 1–1510. In the context of agency action, therefore, they read § 1–171i(g) to forbid only collateral attacks in court, not judicial review.

Initially, we acknowledge the general availability of judicial review of agency decisions. The DCAPA affords such review to "[a]ny person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case . . . ." D.C.Code 1977 Supp., § 1–1510. The "persons" entitled to

5. Respondents observe that this reference to a "Commission . . . bringing suit as a citizen" is a typographical error which should read "Commissioner." We agree. It is the only logical explanation of the phrase in context. Petitioners do not contest this explanation.

review include "public or private organizations of any character . . . ." D.C. Code 1977 Supp. § 1–1502(b)(9). By the terms of this section alone, ANCs clearly would have the capacity to petition this court for review. Section 1–171i(g), however, was enacted after the DCAPA and constitutes a specific limitation on the power of an ANC to litigate. Therefore, if § 1–171i(g) applies to petitions for court review of administrative action, it supersedes the DCAPA.

We conclude that § 1–171i(g) does proscribe such petitions. ANCs are forbidden to "initiate a legal action in the Courts of the District of Columbia or in the Federal courts . . . ." By focusing solely on the word "initiate"—and stressing that the matter of C.J.K.'s license was initiated at the ABC Board, not in court—petitioners overlook the complete prohibition. Section 1–171i(g) forbids an ANC to *"initiate a legal action. . . ."* [Emphasis added.] A petition for judicial review of an agency decision is a wholly separate "legal action"; in contrast with an appeal from a trial court decision, it is not inherently a part of—not a continuation of—the administrative process initiated at the agency level. *See Federal Radio Comm'n v. Nelson Bros. Co.,* 289 U.S. 266, 274–78, 53 S.Ct. 627, 77 L.Ed. 1166 (1932) (Hughes, C. J.); *Red River Broadcasting Co. v. F. C. C.,* 69 App.D.C. 1, 3, 98 F.2d 282, 284 n. 2 (1938); *Indiana Alcoholic Beverage Comm'n v. B & T Distributors, Inc.,* 141 Ind.App. 343, 228 N.E.2d 35, 36–37 (1967); *Southern Ry. Co. v. Public Service Comm'n,* 195 S.C. 247, 10 S.E.2d 769, 772 (1940). It "is similar in nature to an equitable proceeding to restrain the enforcement of an invalid administrative order." *Red River Broadcasting Co. v. F. C.*

C., *supra,* 69 App.D.C. at 3, 98 F.2d at 284 n. 2. Thus, we find unpersuasive the petitioners' argument that the ANCs have not "initiated" the legal action before our court.

Furthermore, petitioners overlook the balance of the prohibition—that an ANC shall not "initiate a legal action *in the Courts.* . . ." We conclude that this language conveys an unqualified intent to preclude ANCs from coming to courts as the initiators of *judicial* action, without regard to whether, as petitioners contend, the "legal action" itself was actually "initiated" at the agency level.[6] There is no basis in the words of the statute or in the legislative history[7] for concluding that the District Council intended to permit ANCs to seek judicial review of governmental agency action while—as petitioners concede—prohibiting ANC actions in the trial court against both public and private bodies. It is likely that the ANCs' principal litigative interest, if allowed by statute, would be review of agency actions, given the variety of governmental impacts which the ANCs are chartered to scrutinize—as this very petition exemplifies. We believe that the District Council would not have enacted the blanket prohibition in § 1–171i(g) had it intended to exempt such a major—if not the major—source of potential ANC litigation.

Our conclusion is buttressed, finally, by the last sentence of § 1–171i(g), which suggests that ANCs should petition the District Council if "legal redress is required." In summary, the role of the ANCs is "advisory," as their very name suggests; they do not have an enforcement responsibility—or authority.

Our conclusion, however, does not mean that the ANCs' right to advise cannot be protected. To the contrary, we hold that

---

**6.** We do not consider the application of § 1–171i(g) to an ANC effort to intervene or file an amicus brief in a court proceeding initiated and substantially financed by others.

**7.** We find no support for petitioners' position in the language of a bill proposed prior to adoption of the ANC Act. Bill 1–193, Section 12(f), 22 D.C.R. 1813, 1816–17, October 10, 1976, provided:

Each Advisory Neighborhood Commission shall have the power to lobby and to present its view to any federal or District agency *but shall not have power to bring suit against any federal or District agencies.* [Emphasis added.]

Because the reasons for the change are not apparent, and reasonable arguments based upon such modification might be made in support of both sides of the present controversy, we place no reliance on this legislative event.

ANC area residents (including ANC Commissioners as individual citizens) have standing to initiate legal action to assert the rights of the ANC itself.[8] We recognize this legal standing of ANC area residents[9] because they satisfy the threshold requirements: injury in fact and assertion of an injury arguably within the "zone of interests" sought to be protected or regulated by the statute in question. *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).[10]

ANCs exist, and are granted statutory rights, powers, and duties, for the benefit of the neighborhood residents they represent. If an ANC's statutory rights are violated and, as a consequence, the performance of its advisory duties is hindered, the actual injury is suffered by the residents themselves; they are the ones harmed by the ANC's inadequate presentation of neighborhood views. Further, the very statutory scheme of the ANC Act is designed to assure effective presentation of neighborhood views through the ANC instrumentality. Thus, any injury to the rights of residents to advise their government is clearly within the zone of interests which the ANC Act seeks to protect. Accordingly, the criteria for standing to seek judicial review of alleged violations of ANC rights are met by area residents. They are "persons aggrieved" by agency action that violates ANC rights; they have suffered "injury in fact" (*see* IV, *infra*) within the "zone of interests" sought to be protected by the ANC Act and other statutes involved in this case. *See* III and IV, *infra.*

In summary, ANCs 3–C and 3–F, as well as the Commissioners of each in their offi-cial rolls, have no capacity to assert the claims in this petition for review and must be dismissed as parties. Nonetheless, the Commissioners and the other petitioner-residents have standing to assert such claims as individuals. Therefore, unless the petition is moot, the court must address all arguments raised, including those involving the rights of the ANCs themselves.

### B. *Mootness*

■ The second preliminary hurdle concerns the alleged mootness of the petition for review of the ABC Board's decision granting a 1976–1977 license. That license expired on January 31, 1977; a 1977–1978 license is now in effect.

In anticipation of the statutory expiration date of the initial license, C.J.K. reapplied in December, 1976, for the year commencing February 1, 1977. The Board scheduled a hearing for January 25, 1977. On that day petitioners filed a protest letter with the Board; on that day, too, the Board reissued the license. Respondents claim that the expiration of the old license and issuance of a new license upon C.J.K.'s reapplication mooted the only controversy (*i. e.,* the challenge to the expired license) because petitioners either did not contest, or did not contest in timely fashion, the reapplication. Petitioners deny the insufficiency of their protest. Moreover, they maintain that the petition is not moot in any event because a favorable court decision can affect the validity of the reissued license. We agree with petitioners.

The doctrine of mootness has emerged to assure that the courts limit their decisions to the resolution of live cases and contro-

---

**8.** *See American University Park Citizens Association v. Burka,* D.C.Super.Ct., Civ. No. 11437–76, June 23, 1977, in which Judge Ugast reached the same conclusion.

**9.** An "area resident" is an individual who resides within the boundaries of a particular "Advisory Neighborhood Commission area" (D.C. Code 1977 Supp., § 1–171a) for which an Advisory Neighborhood Commission has been established. D.C.Code 1977 Supp., § 1–171c.

**10.** The extension of the right to seek judicial review of agency actions to "persons aggrieved" (5 U.S.C. § 702; D.C.Code 1977 Supp., § 1–1510) does not abrogate these ordinary judicial standing requirements. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Data Processing Service v. Camp, supra.*

versies between specific parties.[11] A court should not render a decision if it "cannot affect the matter in issue in the case before it." *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895); *Alpert v. Wolf,* D.C.Mun.App., 73 A.2d 525, 528 (1950). The ABC Board and C.J.K. contend that the omission of a timely protest and demand for a hearing on the reissuance of C.J.K.'s license resulted in disappearance of the subject matter, dissolution of the controversy, and consequent negation of this court's power to affect the rights of the parties. Respondents are wrong for several reasons.

We note, first, that prior to January 25, 1977, counsel for petitioners reached an understanding with counsel for C.J.K. confirming that petitioners continued to protest C.J.K.'s liquor license but that no purpose would be served by putting everyone concerned through another hearing. Petitioners also informed the Board of their continuing objections by letter of January 25, 1977.[12] Because, as a practical matter, a second hearing only four months after the Board's initial decision in all likelihood would have been futile, petitioners' election to pursue their remedy in this court to final resolution (after reaching an understanding with C.J.K. and apprising the Board of their position) was reasonable. Their actions were adequate to preserve their right to contest the hearing upon initial issuance of the license to C.J.K.

Second, the decision of this court will have an impact on the rights of the parties. We note from the Board's own regulations that if the Board had initially denied C.J.

K.'s application, it could not have entertained a second application for a one-year period. 3 DCRR § 2.4(a). Therefore, if the initial license ought not to have been granted, the current, renewal license could not have been issued. In other words, if petitioners prevail in this court and at a new, properly constituted Board hearing, the result will be not merely a refusal to grant the initial license but also, by virtue of 3 DCRR § 2.4(a), a revocation of the second license.

We must recognize, finally, in view of the October 6, 1976, petition for review by this court, the understanding between petitioners' and C.J.K.'s counsel, the petitioners' January 25, 1977, letter to the Board, and, in all probability, the pro forma nature [13] of the renewal of the license on January 25, 1977, that C.J.K.'s 1977–78 license *is* the very subject matter of the present case. If we were not to take this position, there would be a premium on seeking initial issuance of a license very near the end of the statutory license year (January 31), in the hope that a February 1 renewal could be accomplished to moot any potential litigation. Therefore, regardless of regulation 3 DCRR § 2.4(a), circumscribing the Board's power to consider reapplications, we are not powerless to affect the current license. It is, in actuality, the end product of the allegedly defective hearing.

Thus, the mere "renewal" of the license while opposition to its original issuance continued by letter to the Board and by petition to this court did not moot the controversy. We must, therefore, proceed to resolve the issues raised by the petition.

11. Although the District of Columbia Court of Appeals has been established by Congress pursuant to Article I of the Constitution rather than Article III, D.C.Code 1973, § 11–101(2)(A); *Palmore v. United States,* 411 U.S. 389, 406–07, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), our jurisdiction is limited by the same "case or controversy" requirement, see D.C.Code 1973, § 11–705(b), as that imposed on the Article III courts since *Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 5 L.Ed. 257 (1821).

12. Possible untimeliness of the protest under the strict terms of the Board's regulations ought not to bar review here. *See* 3 DCRR § 21.6(b)(3) (commands that "written objec-

tions filed pursuant to a notice concerning . . . reissuance . . . shall . . . be filed at least five (5) calendar days prior to the date of hearing as stated in said notice"). Petitioners did strike an agreement with counsel for C.J.K. to the effect that another hearing would serve no purpose. In addition, the Board did receive the protest letter on the date set for hearing. Thus, petitioners made a good faith effort to preserve their objections.

13. Recall that only posting, not publication, of notice is required when a renewal is sought. *See* note 4, *supra.*

III. *Notice*

Petitioners complain of three separate deficiencies in the Board's notice procedures for the rescheduled hearing, namely (1) the failure to dispatch "special notice" to the two ANCs concerned about the pending application, (2) the failure to notify known remonstrants of the rescheduling of the hearing on the application, and (3) the failure to post notice of the rescheduled hearing on C.J.K.'s premises.

A. *Special Notice to Advisory Neighborhood Commissions*

At the ABC Board hearing, petitioners insisted that the Board had erred by not directing special notice [14] to ANCs 3–C and 3–F, as required by two statutes:

—Section 738 of the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L.No.93–198, 87 Stat. 774 (1973) (the "Home Rule Act"), and

—Section 13 (codified as § 1–171i) of the ANC Act, *supra.*

In response, the Board sought the opinion of the District's Corporation Counsel. On August 23, 1976, prior to the Board's decision, the Corporation Counsel issued an opinion rejecting the necessity of special notice in these circumstances. The Board relied on this statutory interpretation in its findings, conclusions, and order, and urges us to affirm the Corporation Counsel's view.

We are presented with a question of first impression about the proper interpretation of the Congressional and District Council legislation governing ANCs. Our analysis begins with the Home Rule Act, specifically § 738(c)(1) and § 738(d), which provide:

(c) Each advisory neighborhood commission—

(1) *may advise* the District government on matters of *public policy* including decisions regarding planning, streets, recreation, social services programs, health, safety, and sanitation in that neighborhood commission area;

. . . . .

(d) *In the manner provided by act of the Council,* in addition to any other notice required by law, *timely notice shall be given to each advisory neighborhood commission of requested or proposed* zoning changes, variances, public improvements, *licenses* or permits *of significance to neighborhood planning and development* within its neighborhood commission area for its review, comment, and recommendation. [Emphasis added.]

The "manner provided by act of the Council" for implementing this "timely notice" provision in § 738(d) is elaborated in § 13 of the ANC Act, codified in D.C.Code 1977 Supp., § 1–171i(a)–(c):

(a) *Each Advisory Neighborhood Commission* (hereinafter in sections 1–171i to 1–171*l* the "Commission") *may advise* the Council of the District of Columbia, the Mayor and each Executive Agency and *all independent agencies, boards and commissions of the government of the District of Columbia with respect to all proposed matters of District government policy* including decisions regarding planning, streets, recreation, social services programs, education, health, safety and sanitation *which affect the Commission area.* For the purposes of this act, proposed actions of *District government policy* shall be the same as those for which prior notice of proposed rule-making is required pursuant to section 1–1505(a) [the DCAPA] or as pertains to the Council of the District of Columbia.

(b) *Thirty days written notice of such District government action or proposed actions shall be given by mail to each Commission affected by said actions,* except where shorter notice on good cause made and published with the notice may be provided or in the case of an emergency and such notice shall be published in the District of Columbia Register. . .

14. "Special notice" refers to the "thirty-days' written notice . . . by mail" mandated by D.C.Code 1977 Supp., § 1–171i(b).

(c) Proposed District government actions covered by this act shall include, but shall not be limited to, actions of the Council of the District of Columbia, the Executive Branch or independent agency. *In addition to those notices required in subsection (a) above, each agency, board and commission shall,* before the award of any grant funds to a citizen organization or group, or *before the formulation of any final policy decision or guideline with respect to* grant applications, comprehensive plans, requested or proposed zoning changes, variances, public improvements, *licenses,* or permits *affecting said Commission area,* the District Budget and city goals, and priorities, proposed changes in District government service delivery and the opening of any proposed facility systems, *provide to each affected Commission notice of the proposed action as required by subsection* (b). Each District of Columbia agency shall maintain a record of such notices sent to each Commission. [Emphasis added.]

The Corporation Counsel's opinion essentially states that ANCs are only entitled to "thirty days written notice" of legislative (*i. e.*, rule-making and District Council) proposals; special notice is not required in adjudicative situations, such as issuance of a liquor license. More specifically, § 1–171i(a) calls for ANC advice "with respect to all proposed matters of District Government *policy,*" and then defines all "proposed actions of District government *policy . . .* as those for which prior notice of proposed *rule-making* is required . . . or as pertains to the *Council of the District of Columbia.*" [Emphasis added.] Similarly, § 1–171i(c) calls for thirty-days' notice to "each affected" ANC, pursuant to § 1–171i(b), "before the formulation of any final *policy* decision or guideline with respect to . . . *licenses* . . . affecting said Commission area." It follows, say the respondents, in reliance on the Corporation Counsel, that ANCs are only entitled to special, thirty-day notice of rule-making or other legislative activity concerning the issuance of liquor licenses generally. Both § 1–171i(a) and § 1–171i(c), they say, refer to *policy* formulation, not to implementation through the adjudicative process.

Our primary task must be to effectuate the intent of Congress and the District Council, as expressed in the Home Rule and ANC Acts, respectively. *See Bailey v. United States,* D.C.App., 223 A.2d 190, 191 (1966). Mindful of the fact that the ANC Act was adopted for the express purpose of implementing the Home Rule Act (as it pertains to ANCs), we see revealing parallels that clarify the legislative intent—and do so contrary to the Corporation Counsel's interpretation.

Section 1–171i(a) of the ANC Act, by virtue of its reference to the DCAPA and to the District Council, is confined to general policy decisions—to rule-making or District Council action. It virtually *tracks* the language of § 738(c)(1) of the Home Rule Act, a subsection likewise concerned solely with policy determinations. On the other hand, § 1–171i(c) of the ANC Act, the subsection which petitioners find applicable to C.J.K.'s liquor license application, enumerates "additional" matters requiring special notice. In so doing it is notably similar to § 738(d) of the Home Rule Act. In fact, the language in the two statutes requiring notice to ANCs of "requested or proposed zoning changes, variances, public improvements, licenses, or permits" is identical. We find the similarities—including the quoted identities—to be more than coincidental. We see in such likeness the intent that § 1–171i(c) specifically implement § 738(d)'s mandate that "timely notice *shall* be given . . . of requested or proposed . . . *licenses . . .* of significance to neighborhood planning and development within its neighborhood commission area. . ." [Emphasis added.]

▆ By focusing on the parallels between the two Acts, and thus reading § 738(d) and § 1–171i(c) together, we conclude that § 1–171i(c) requires timely written notice to ANCs in adjudicative situations, such as the issuance of particular liquor licenses; we do not believe that the words "policy decision or guideline," as used in § 1–171i(c), indi-

cate an intent to limit such special notice to legislative-type actions. We have three reasons: First, most of the matters enumerated in § 1–171i(c) are specific activities directed at an ANC area. "Proposed zoning changes, variances, public improvements, licenses, or permits," for example, are usually discrete, local issues rather than the subjects of general policy-making. Second, if § 1–171i(c) were limited to legislative activities, it would be wholly redundant when compared with the earlier "legislative" provision, § 1–171i(a). Statutory interpretations which result in redundancy are disfavored. *Wirtz v. Cascade Employer's Ass'n, Inc., of Pacific Northwest,* 219 F.Supp. 84 (D.D.C.1963). Finally, § 738(d) of the Home Rule Act itself manifests an intention that timely notice be given of *all* "requested or proposed zoning changes, variances, public improvements, licenses or permits of significance" to a neighborhood— clearly discrete events. Absent adoption of the ANC Act, probably no one seriously would contend that only legislative activity is "of significance" to a neighborhood, and that § 738(d) accordingly limits timely notice to requested or proposed legislative actions. If, therefore, we were to limit the provisions of § 1–171i(c) to legislative concerns, we would eviscerate the express language of the Home Rule Act itself.[15]

Still, the above analysis informs us only that § 738(d) and § 1–171i(c) embrace more than proposed policy decisions. It does not tell us how much more. An ANC is not necessarily entitled to special, thirty-day notice of *every* neighborhood matter listed in § 1–171i(c) of the ANC Act, for § 738(d) of the Home Rule Act limits such notice to matters "*of significance* to neighborhood planning and development." [Emphasis added.]

We do not intend, on the basis of this one case, to propose an inflexible standard for determining "significance" in every situation. At a minimum, however, we have concluded, and accordingly hold, that every proposed governmental decision affecting neighborhood planning and development, as defined in § 1–171i(c), for which a *prior hearing* is required by law is sufficiently significant to require written notice, pursuant to § 1–171i(b), to the affected ANC or ANCs.[16] The legislative decision to require a public hearing is an implicit determination of considerable significance of a proposed action. Because some form of public notice will already be required in such situations, the additional demand of special notice to affected ANCs will not be unduly burdensome. (The burden will be even less in connection with an ABC Board hearing, for the Board is required in any event to notify all known remonstrants personally when a hearing is scheduled. 3 DCRR § 20.1; *see* III.B., *infra.*)

We do not imply that all administrative agency matters for which hearings are *not* required are automatically excluded from the realm of significance. While it is difficult to conceive of many matters, not requiring a hearing, which would be sufficiently significant to neighborhood planning and development to warrant special notice to an ANC, we do not wish categorically to exclude all such cases.

The implications of our analysis for this case are as follows: The ABC Board's statutory and regulatory frameworks provide for noticed hearings on liquor license applications and reapplications.[17] Therefore, such applications are of significance to neighborhood planning and development and special notice, *i. e.,* thirty-days written

---

**15.** Petitioners argue that if § 1–171i cannot be read consistently with § 738, the former must yield to the latter by virtue of the Supremacy Clause (U.S.Const. art. VI, § 2). Since we do not find these sections irreconcilable, we do not express an opinion on this question of the constitutional relationship between the Home Rule Act and its implementing legislation promulgated by the District of Columbia Council.

**16.** Respondents have not contested petitioners' claim that *two* ANCs, 3–C and 3–F, were entitled to special notice, and the record does not make clear why both are affected here. We assume that their boundary line runs very close to C.J.K.'s premises.

**17.** D.C.Code 1973, § 25–115(b); 3 DCRR § 20.1 *et seq.*

notice pursuant to D.C.Code 1977 Supp., § 1–171i(b), must be sent to all affected ANCs. We hold that the Board's failure in this case to give such notice to ANCs 3–C and 3–F was error.

The ABC Board and C.J.K. have maintained, nevertheless, that even if special notice had been required, the technical failure to comply with the statute did not prejudice ANCs 3–C and 3–F because they had received actual notice. We agree that the error here was cured by actual notice; it is therefore not reversible.

> The requirements of procedural due process are met if upon review the court is satisfied that a complainant was given an adequate opportunity to prepare and present its position . . . and that no prejudice resulted from the originally deficient notice.

*Watergate Improvement Ass'n v. Public Service Commission,* D.C.App., 326 A.2d 778 (1974). *See Schiffmann v. District of Columbia A.B.C. Board,* D.C.App., 302 A.2d 235 (1973). Petitioners concede in their brief that Gary and Judy Kopff themselves notified ANCs 3–C and 3–F of the hearing on C.J.K.'s application, that the ANCs met and adopted resolutions expressing their positions on the matter, and that representatives attended the hearing and were prepared to present the ANCs' views and recommendations. We therefore can perceive no prejudice from the technical defect. While petitioners assert prejudice, they do not specify its manner or impact. We are satisfied that actual notice remedied the error and rendered it non-reversible.

B. *The Requirements of Notice to Known Remonstrants and of Posting Notice on the Premises*

The basic statutory scheme underlying the creation and operation of the Alcoholic Beverage Control Board specifies that

[b]efore granting a [Class C retailers] license . . . the Board shall give notice by advertisement published once a week and for at least two weeks in some newspaper of general circulation in the District of Columbia. . . . *There shall also be posted by the Board a notice, in a conspicuous place, on the outside of the premises. This notice* shall state that remonstrants are entitled to be heard before the granting of such license and *shall name the same time and place for such hearing as set out in the public advertisement* . . . . [D.C.Code 1973, § 25–115(b); emphasis added.]

In addition, the Board's implementing regulations state that

[t]he Board shall . . . notify all persons required to be heard in any hearing or proceeding before it . . . [including] *remonstrants, if known.* The notice shall include information relating to the nature of said hearing or proceeding and *the time and place when and where* said hearing or proceeding will be conducted. [3 DCRR § 20.1; emphasis added.]

▮ Petitioners complain that upon rescheduling the hearing on C.J.K.'s application, the ABC Board failed to comply with this statute and regulation.[18] The Board does not deny that it failed to post notice of the rescheduled hearing; nor does the Board deny that it neglected to notify the known remonstrants. Instead, the Board and C.J.K. argue that actual notice to all petitioners present at the rescheduled hearing cured the technical defect, that the notice mailed to Mrs. Kopff sufficed for all other known remonstrants, and that "no person allegedly without notice has appeared in protest." The Board's defenses to its admitted failures to comply with the statutory notice requirements are not sound.[19]

---

**18.** Petitioners also argue that the Board violated the DCAPA. That act, however, is not a solid basis for reliance, for it merely requires "reasonable notice" to "parties." D.C.Code 1977 Supp., § 1–1509(a).

**19.** Although respondents do not contend that the statutes and regulations are inapplicable to "reschedulings," it is important to emphasize that reschedulings of administrative hearings are subject to the same notice requirements as initial schedulings. The literal statutory terms mandate inclusion of the "time" of the hearing

First, specific notice to Mrs. Kopff cannot fulfill the Board's duty to notify all known remonstrants. Even though the Kopffs collected and presented to the Board the signatures of neighbors who did object to the application, they did not assume the Board's statutory responsibility. We cannot endorse the Board's attempt to shift to private persons its responsibility for the notification of known remonstrants. Additionally, actual notice to individuals who did appear cannot remedy the lack of notice either to those who were known but not apprised of the rescheduling, or to those who might have seen an accurate "posting" on the premises—but did not. Absent potential witnesses remain prejudiced. Accordingly, the Board violated both its duty to notify "known remonstrants," 3 DCRR § 20.1, and its duty to post notice on the premises. D.C.Code 1973, § 25–115(b). Neither deficiency could be cured by actual notice to those who appeared.

The Board's and C.J.K.'s reliance on this court's opinion in *Schiffmann v. District of Columbia A.B.C. Board, supra,* is misplaced. There, this court held that actual notice to the petitioners cured, as to them, any failure to give notice by publication. Petitioners here, however, do not assert a lack of notice to themselves. They assert the rights of those who were entitled to notice but did not receive it and, as a consequence, did not appear at the hearing. (Respondents do not challenge petitioners' standing to assert these rights.) The argument that "no person allegedly without notice has appeared in protest" is illogical. We cannot expect unnotified individuals to petition for review of an ABC Board decision of which they still may not be aware. We hold, therefore, that in failing to give the notices required by D.C.Code 1973, § 25–115(b) and 3 DCRR § 20.1, the Board did not afford all potentially concerned individuals an adequate opportunity to be heard. As a result,

the Board's capacity for effective assessment of "neighborhood wishes" was impaired.[20] We shall not speculate about how many more would have attended the hearing if proper notice had been given, or about whether additional attendance would have contributed to the dialogue. That is irrelevant. Because a statutory right to due notice has been violated and cannot be cured until everyone receives notice, the error cannot be deemed harmless.[21]

IV. *Attribution of "Great Weight" to the "Issues and Concerns" of Advisory Neighborhood Commissions*

D.C.Code 1977 Supp., § 1–171i(d) provides, in pertinent part:

> *Each Commission so notified [i. e., in writing] . . . shall forward its written recommendations . . . to the appropriate agency . ... The issues and concerns raised in the recommendations of the Commission shall be given great weight during the deliberations by the governmental agency and those issues shall be discussed in the written rationale for the governmental decision taken.* [Emphasis added.]

This subsection mandates that the ABC Board give "great weight" to all "issues and concerns" raised by ANCs in all cases where written notice to ANCs is required. Our next task, therefore, is to determine the meaning of the statutory words "great weight."

Petitioners assert, first, that the recommendations of citizens' groups are normally given "careful consideration" in administrative proceedings. They maintain that the legislative choice of the term "great weight," rather than "careful consideration," in the ANC context must imply greater deference than that accorded ordinary citizens' groups. Second, petitioners

---

in posted, published, and mailed notices. Certainly, this time must be accurately stated and kept current, lest the very purpose of notification—provision of an opportunity to be heard—would be defeated.

**20.** *See* D.C.Code 1973, § 25–115(a)6.

**21.** The reference in the Board's findings of fact to the paucity of witnesses who appeared to oppose the license implies a possibility that a greater number of opponents could have influenced the Board's decision. Rec. at 274, ¶ 40.

**1384**

stress the canon of statutory construction which declares that legal terminology ordinarily should be given its accepted legal meaning. They then cite cases holding that an expert agency's construction of its own enabling statute should be given "great weight," and that a court should adopt the agency's construction unless it is unreasonable. Petitioners urge us to conclude that ANC recommendations are entitled to similar deference at agency hearings. We are not persuaded.

First, the cases cited by petitioners do not establish a "careful consideration" standard for citizens' group concerns, nor do they define such terms.[22] Thus, these cases do not provide a reference point for defining the "great weight" standard. Second, ANC recommendations, whether in a legislative or administrative context, are not analogous to legal interpretations of enabling statutes by expert administrative agencies charged with regulatory or other governmental responsibilities. If the Board were to afford the degree of weight to ANC judgments urged by petitioners, it would tread perilously close to, if not cross into, the realm of improper delegation of its governmental authority to a private party. True—the ANCs have governmental responsibilities in the sense that they are created by statute, elected by the general public, and funded by the taxpayers. But neither Congress nor the District Council has even hinted at granting ANCs responsibilities for governmental operations. They are advisory only. To construe their enabling statutes in a way that would grant the ANCs "expert" status, entitled to special deference as such, would be to sanction interference with the established pattern of governmental relationships. We find no ' such intention in either the Home Rule Act or the ANC Act.

We conclude that "great weight," as used in the ANC Act, does not build in some kind of quantum or presumption of deference to be accorded ANCs. It means, rather, that an agency must elaborate, with precision, its response to the ANC issues and concerns. It is a statutory method of forcing an agency to come to grips with the ANC view—to deal with it in detail, without slippage. In doing so an agency must focus particular attention not only on the issues and concerns as pressed by an ANC, but also on the fact that the ANC, as a representative body, is the group making the recommendation. That is, the agency must articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances. In summary, government agencies are charged to pay specific attention to the source, as well as the content, of ANC recommendations, giving them whatever deference they merit in the context of the entire proceedings, including the evidence and views presented by others.

■ Although "great weight" in this context is not a quantum requirement, we do not accept respondents' view that the ANC itself need not be mentioned in an ABC Board decision, as long as the "issues and concerns" of the ANC receive the requisite consideration. To the contrary, we believe that "great weight" implies explicit reference to each ANC issue and concern as such, as well as specific findings and conclusions with respect to each. Although the statutory language literally does not require such acknowledgment of the ANC source, we have concluded—and hold—that such acknowledgment is implicit in the very purpose of § 1–171i(d) of the ANC Act. It is necessary not only to assure compliance with the "great weight" mandate but also to facilitate judicial review. Without such attribution, there is a danger that an agen-

**22.** *Citizens Ass'n of Georgetown, Inc. v. Alcoholic Beverage Control Board*, D.C.App., 268 A.2d 801 (1970); *Sophia's Inc. v. Alcoholic Beverage Control Board*, D.C.App., 268 A.2d 799 (1970). Both cases simply deal with the general requirement that the Board find premises "appropriate" in light of neighborhood wishes and character. In *Georgetown* the Board had noted that it had given "careful consideration" to the protests of both residents and the citizens' association. The court, however, did not adopt that language as a standard of review for the Board.

cy, while dealing with ANC issues and concerns, would not analyze the matter in a way that evidences serious attention to the ANC source itself.

In this case, the ABC Board failed to give "great weight" to the issues and concerns of ANCs 3–C and 3–F, as we have construed that standard. It is unclear whether the Board even admitted into evidence the resolution of ANC 3–C. *See V, infra.* In any event, it *is* clear that the Board was not cognizant of its duty to give ANC issues great weight.[23] Under the circumstances, we must remand the case to the Board for explicit consideration of the ANC positions upon rehearing.

## V. *Evidentiary Rulings*

In ruling upon the admissibility of evidence at the hearing, the Board was subject to two specific constraints. First, the DCA-PA permits administrative agencies to receive "any oral or documentary evidence" but mandates the exclusion of "irrelevant, immaterial and unduly repetitious evidence." D.C.Code 1977 Supp., § 1–1509(b). Second, the Board's own regulation, 3 DCRR § 20.5, limits the evidence at hearings to

. . . material evidence relative to the issues arising in the proceeding as may be necessary to protect the public interest or to prevent injustice. Evidence will be excluded in the discretion of the Board if it is repetitious or redundant. The Board shall determine the materiality, relevance and probative value of any evidence submitted.

Petitioners assert that three of the Board's evidentiary rulings, namely the exclusion of ANC 3–C's resolution opposing the license, Mr. Kopff's neighborhood survey, and Mr. Smith's "Metro" data, violated these guidelines. Petitioners maintain that the Board ignored the principle of liberal, flexible admission of evidence in administrative proceedings.

■ The case law and other legal authorities recognize that the strict rules of evidence applicable to the trial of cases are of limited use in the administrative arena. Because there is no jury to shield, and individual agency members are presumed capable of properly assessing the reliability and weight of evidence, greater flexibility and discretion as to admission are permitted. 2 Davis, Administrative Law Treatise § 14.01 *et seq.* (1958). Failure to apply these generous principles of admissibility can be a basis for reversal of an agency decision, although prejudice must be shown. *Wallace v. District Unemployment Comp. Board,* D.C.App., 294 A.2d 177 (1972); *Carter-Wallace, Inc. v. Gardner,* 417 F.2d 1086 (4th Cir. 1969). Our present inquiry, therefore, is whether the Board erred in excluding the specified items and, if so, whether prejudice resulted.

### A. *The ANC Resolution*

ANC 3–C became aware of the pending application when notified by Mr. Kopff. Subsequently, at a regular meeting, the ANC discussed the application and adopted a resolution to oppose it. Commissioner Sam Smith submitted this resolution to the ABC Board at the hearing.

It is difficult to determine whether the resolution of ANC 3–C was or was not admitted over hearsay objections; the Board took admissibility under advisement. Considering our conclusion that ANC issues and concerns are entitled to great weight, as well as the ANC's statutory mandate to forward its recommendations to the Board, exclusion would have been error. In this instance, however, even if we assume that the resolution was erroneously excluded on hearsay grounds, we need not evaluate prejudice. Because we are remanding for other reasons, we merely suggest that the Board not exclude such evidence at the new hearing.

---

**23.** When witness Arthur Meigs inquired whether the Board intended to give the ANCs' recommendations great weight, Chairman Hill replied, "The Board will consider all evidence having relevance to this case."

B. *Mr. Kopff's Survey and Mr. Smith's Metro Data*

■■■ Mr. Kopff proffered a survey of residents' views about the proposed license. Mr. Smith proposed to summarize information regarding the potential congestive impact of a Metro station under construction nearby. Although the Board could have admitted both of these items despite their hearsay nature, it had discretion under the applicable guidelines to reject the evidence as unreliable; and, even if this evidence should have been admitted, the Board could have discounted both items as having no probative value. We can find neither an abuse of discretion nor prejudice to petitioners from the rulings.

## VI. Adequacy of the ABC Board's Findings and Conclusions

We could end the inquiry without evaluating the Board's findings and conclusions, for they were based upon testimony derived from incomplete notice of the June 9, 1976, hearing. There are, nevertheless, good reasons to address the Board's determinations. First, the parties should not resubmit the matter to the Board with apprehensions about how we view the proceedings to date. Second, the question whether C.J.K.'s license should remain in effect pending a new determination cannot be resolved prop-

erly without evaluating what took place at the last hearing.[24]

Petitioners have advanced two challenges to the sufficiency of the Board's findings and conclusions: (A) that the findings of fact and conclusions of law are fatally incomplete and lacking in detail, and (B) that such findings and conclusions are not supported by substantial evidence.

A. *The Completeness and Detail of the Board's Findings and Conclusions*

The DCAPA specifies that all contested case decisions and orders must be "accompanied by findings of fact and conclusions of law," and that the "findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact." D.C.Code 1977 Supp., § 1–1509(e).[25] In *Palmer v. Board of Zoning Adjustments,* D.C.App., 287 A.2d 535, 538 (1972), we have interpreted this provision to require

findings of fact *of a basic or underlying nature* necessary to a determination of ultimate facts, usually stated in terms of the statutory criteria. Without such findings there is no guarantee that "cases [will] be decided according to the evidence and the law, rather than arbitrarily or from extra-legal considerations" [footnotes omitted; emphasis added].

We stated that such findings were essential for "intelligent judicial review." *Id.*

(1) the boundaries of previously defined neighborhood;

(2) a finding under Section 14(a)6 of the ABC Act as to the appropriateness of the place for which the license is sought, considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood of the premises for which the license is desired;

(3) a finding as to the applicability of Section 14(c) of the ABC Act [pertaining to written objections of real property owners within 600 feet of the property];

(4) a finding as to the applicability of Section 21.2 of this title [precluding issuance of a license within 400 feet of schools, churches, and public recreation areas]; and

(5) that the place for which the license is sought to be issued is or is not appropriate.

(b) The Board shall make Findings of Fact and Conclusions necessary for a proper determination of said hearing.

---

**24.** Our court, as appropriate to the circumstances, has authority to "affirm, modify, or set aside the order or decision complained of, in whole or in part, and, if need be, to remand the case for further proceedings, as justice may require . . . [and] may order a stay upon appropriate terms." D.C.Code 1977 Supp., § 1–1510.

**25.** The Board's own regulatory scheme, 3 DCRR § 21.7, adopted pursuant to D.C. Code 1973, § 25–107, imposes additional requirements:

(a) Within a reasonable time after the close of a hearing of an original application, or the transfer of an existing license to a new location, the Board shall make specific Findings of Fact as required under the provisions of Sections 14(a)6 and 14(c) of the ABC Act [D.C.Code 1973, § 25–115(a)(6) and § 25–115(c)] and Section 21.2 of this title. Such findings shall include but not be limited to the following:

■ Petitioners contend that the ABC Board's findings do not address each contested issue and, therefore, that they thwart effective appellate review. They rely specifically upon 3 DCRR § 21.7(a)(2), *supra* note 25, and the omission of particular attention to potential Metro station impact. We find the Board's written findings and conclusions adequate (based on the evidence presented); we reject these assignments of error.

The Board made specific findings on all the issues raised by the petitioners: (1) saturation of liquor licenses, (2) parking and traffic, (3) refuse storage, (4) the character of the neighborhood, and (5) neighborhood wishes and desires. The Board also made all the findings specifically required by the Alcoholic Beverage Control statutes and regulations. D.C.Code 1973, § 25–115; 3 DCRR § 21.7. The Board accordingly demonstrated the necessary concern for all contested issues and paid particular attention to the statutory elements of neighborhood surroundings (including Metro impact upon parking) and residents' wishes. *See* 3 DCRR § 21.7(a)(2). The findings upon each issue, moreover, are sufficiently detailed for the effective performance of this court's review duties; *i. e.*, assessment of the rationality of and evidentiary support for the Board's conclusions.

### B. *Substantiality of the Evidence*

"Findings of fact and conclusions of law shall be *supported by and in accordance with* the reliable, probative, and *substantial evidence.*" D.C.Code 1977 Supp., § 1–1509(e). [Emphasis added.] Therefore, even though we have determined that the Board's findings are sufficiently complete and detailed, we must reverse if we find that the Board failed to support its findings and conclusions with substantial evidence. D.C.Code 1977 Supp., § 1–1510(3)(E).

Substantial evidence has been defined as "more than a mere scintilla"; *i. e.*, "such relevant evidence as reasonable minds might accept as adequate to support the conclusion." *Vestry of Grace Parish v. District of Columbia A.B.C. Board*, D.C.App., 366 A.2d 1110, 1112 (1976). While the existence of this quantum of evidence is necessary, it is not sufficient, for there also

. . . must be a *demonstration* in the findings *of a "rational connection* between facts found and the choice made." [*Brewington v. District of Columbia Board of Appeals and Review*, D.C.App., 299 A.2d 145, 147 (1973); citation omitted; latter emphasis added.] [26]

■ After a thorough review of the hearing record and the Board's determinations, we have concluded that for each of the five issues posed by petitioners, the Board could point to "more than a mere scintilla" of rationally connected evidentiary support. We must therefore reject petitioners' contention here.[27]

### VII. *Conclusion*

We hold that the Board committed reversible error by its (1) failure to notify

---

**26.** It is thus our duty to assess both substantiality and the logical connection between the evidence and conclusions, but not to substitute our judgment for that of the administrative agency. *Schiffmann v. District of Columbia A.B.C. Board, supra.* *See* D.C.Code 1977 Supp., § 1–1510(3)(E).

**27.** Petitioners allege one additional error in the Board's failure to define the relevant neighborhood, for the purpose of C.J.K.'s application, as coextensive with ANC boundaries. They cite no authority for this proposition. The only pertinent regulation of the Board's power and duty to specify the affected neighborhood is in 3 DCRR § 21.1, which states:

Upon the filing of an application for the issuance of an original or the transfer to a different location of an existing license, except a retailer's license Class E or F, the Board shall promptly delineate or define the boundary lines of the 'neighborhood' under Section 14(a)6 of the ABC Act and shall in all advertisements and public notices published or posted concerning said applications set forth the boundary lines of such 'neighborhood' to the nearest public roadway, natural boundary or thoroughfare.

We find no mandate there, or in the ANC Act or elsewhere, for conforming the neighborhood to ANC boundaries, and we decline to engage in the judicial legislation necessary to create and impose such a requirement upon the Board.

known remonstrants of the rescheduling of the hearing on C.J.K.'s application from May 20, 1976, to June 9, 1976, (2) failure to post notice of the rescheduled hearing on the C.J.K. premises, and (3) failure to give great weight to the issues and concerns of the affected ANCs. We further hold that it was error (although not a basis for reversal here) not to deliver written notice to ANCs 3–C and 3–F at least thirty days before the initial and rescheduled hearing dates. We therefore remand the proceeding to the ABC Board for prompt conduct of a new hearing upon the appropriateness of issuing a Class C retailer's license to C.J.K.

One final comment. Because the Board's findings and conclusions, based on the evidence before it (which included the issues and concerns of ANCs 3–C and 3–F), were sufficiently detailed and supported by substantial evidence, it would be inequitable to terminate C.J.K.'s 1977–78 license prior to a new determination by the ABC Board itself in conformity with this opinion. Thus, C.J. K.'s Class C retailer's license shall remain in effect until further order of the ABC Board, timely made.

*Remanded for further proceedings.*