CALIFANO, SECRETARY OF HEALTH, EDUCATION,
AND WELFARE *v.* BOLES ET AL.

No. 78–808.   Argued April 25, 1979—Decided June 27, 1979

REHNQUIST, J., delivered the opinion of the Court, in which BURGER,
C. J., and STEWART, POWELL, and STEVENS, JJ., joined. MARSHALL, J.,
filed a dissenting opinion, in which BRENNAN, WHITE, and BLACKMUN, JJ.,
joined, *post,* p. 297.

*Harriet S. Shapiro* argued the cause for appellant. With
her on the briefs were *Solicitor General McCree, Assistant
Attorney General Babcock, William Kanter,* and *Susan A.
Ehrlich.*

*Herbert Semmel* argued the cause for appellees. With him on the brief was *Nancy Duff Campbell.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Since the Depression of the 1930's, the Government has taken increasingly upon itself the task of insulating the economy at large and the individual from the buffeting of economic fortune. The federal old-age, survivors, and disability insurance provisions of the Social Security Act (SSA) are possibly the pre-eminent examples: attempts to obviate, through a program of forced savings, the economic dislocations that may otherwise accompany old age, disability, or the death of a breadwinner. As an exercise in governmental administration, the social security system is of unprecedented dimension; in fiscal year 1977 nearly 150 million claims were filed.[1]

Given this magnitude, the number of times these SSA claims have reached this Court warrants little surprise.[2] Our

---

[1] Social Security Administration's Office of Management and Administration, The Year in Review: The Administration of Social Security Programs 1977, p. ii (July 1978).

[2] *Califano* v. *Yamasaki,* 442 U. S. 682 (1979); *Califano* v. *Jobst,* 434 U. S. 47 (1977); *Califano* v. *Webster,* 430 U. S. 313 (1977); *Califano* v. *Goldfarb,* 430 U. S. 199 (1977); *Mathews* v. *De Castro,* 429 U. S. 181 (1976); *Norton* v. *Mathews,* 427 U. S. 524 (1976); *Mathews* v. *Lucas,* 427 U. S. 495 (1976); *Mathews* v. *Eldridge,* 424 U. S. 319 (1976); *Weinberger* v. *Salfi,* 422 U. S. 749 (1975); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *Richardson* v. *Wright,* 405 U. S. 208 (1972); *Richardson* v. *Belcher,* 404 U. S. 78 (1971); *Richardson* v. *Perales,* 402 U. S. 389 (1971); *Flemming* v. *Nestor,* 363 U. S. 603 (1960). Many other cases have been disposed of by summary action. This Court has also had numerous cases involving claims arising under federal-state cooperative welfare programs authorized by the SSA. See, *e. g., Graham* v. *Richardson,* 403 U. S. 365 (1971) (Assistance to Persons Permanently and Totally Disabled); *California Human Resources Dept.* v. *Java,* 402 U. S. 121 (1971) (unemployment insurance); *Dandridge* v. *Williams,* 397 U. S. 471 (1970) (Aid to Families With Dependent Children).

cases evidence a sensitivity to the legislative and administrative problems posed in the design of such a program and in the adjudication of claims on this scale. The problems are generally of two types. The first is categorization.[3] In light of the specific dislocations Congress wishes to alleviate, it is necessary to define categories of beneficiaries. The process of categorization presents the difficulties inherent in any line-drawing exercise where the draftsman confronts a universe of potential beneficiaries with different histories and distinct needs. He strives for a level of generality that is administratively practicable, with full appreciation that the included class has members whose "needs" upon a statutorily defined occurrence may not be as marked as those of isolated individuals outside the classification. "General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." *Califano* v. *Jobst,* 434 U. S. 47, 53 (1977). A process of case-by-case adjudication that would provide a "perfect fit" in theory would increase administrative expenses to a degree that benefit levels would probably be reduced, precluding a

---

[3] The bulk of our cases fall under this heading. *Califano* v. *Jobst, supra* (termination of dependent child's benefits upon his marriage); *Califano* v. *Webster, supra* (gender-based differences in benefit computation); *Califano* v. *Goldfarb, supra* (gender-based differences in defining dependent of deceased wage earner); *Mathews* v. *De Castro, supra* (denial of "wife's insurance benefits" to divorced women under 62 years of age); *Norton* v. *Mathews, supra* (illegitimate children denied presumption of dependency enjoyed by legitimates); *Mathews* v. *Lucas, supra* (same as *Norton*); *Weinberger* v. *Salfi, supra* (duration-of-relationship requirements for receipt of mother's or child's insurance benefits); *Weinberger* v. *Wiesenfeld, supra* (gender-based denial of survivor's benefits to widowers); *Jimenez* v. *Weinberger, supra* (denial of disability insurance benefits to illegitimate children born after onset of wage earner's disability); *Richardson* v. *Belcher, supra* (reduction in social security benefits to reflect state workmen's compensation benefits); *Flemming* v. *Nestor, supra* (termination of insurance benefits to aliens upon their deportation).

perfect fit in fact. *Mathews* v. *Lucas,* 427 U. S. 495, 509 (1976); *Weinberger* v. *Salfi,* 422 U. S. 749, 776–777 (1975).

The second type of problem that has been brought to this Court involves the Social Security Administration's procedures for dispute resolution where benefits have been denied, decreased, or terminated because the Administration has concluded that the claimant is not entitled to what he has requested or to what he has received in the past.[4] Again the Court has been sensitive to the special difficulties presented by the mass administration of the social security system. After the legislative task of classification is completed, the administrative goal is accuracy and promptness in the actual allocation of benefits pursuant to those classifications. The magnitude of that task is not amenable to the full trappings of the adversary process lest again benefit levels be threatened by the costs of administration. *Mathews* v. *Eldridge,* 424 U. S. 319, 343–349 (1976); *Richardson* v. *Perales,* 402 U. S. 389, 406 (1971). Fairness can best be assured by Congress and the Social Security Administration through sound managerial techniques and quality control designed to achieve an acceptable rate of error.

This case involves a challenge to a categorization. Appellees Norman J. Boles and Margaret Gonzales represent a nationwide class of all illegitimate children and their mothers who are allegedly ineligible for insurance benefits under the SSA because in each case the mother was never married to the wage earner who fathered her child. Section 202 (g)(1) of the SSA, as amended, 42 U. S. C. § 402 (g)(1), only makes "mother's insurance benefits" available to widows and di-

---

[4] *Califano* v. *Yamasaki, supra* (lack of prerecoupment oral hearing in overpayment cases); *Mathews* v. *Eldridge, supra* (question whether evidentiary hearing necessary before termination of disability insurance benefits); *Richardson* v. *Wright, supra* (challenge to procedures employed in suspension or termination of disability benefits); *Richardson* v. *Perales, supra* (written reports by physicians who have examined disability insurance claimants are "substantial evidence" supporting denial of benefits).

vorced wives.[5] By virtue of this Court's decision in *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975), "mother's insurance benefits" are available to widowers, leaving the title

[5] Section 202 (g) (1), as set forth in 42 U. S. C. § 402 (g) (1), provides:

"(1) The widow and every surviving divorced mother (as defined in section 416 (d) of this title) of an individual who died a fully or currently insured individual, if such widow or surviving divorced mother—

"(A) is not married,

"(B) is not entitled to a widow's insurance benefit,

"(C) is not entitled to old-age insurance benefits, or is entitled to old-age insurance benefits each of which is less than three-fourths of the primary insurance amount of such individual,

"(D) has filed application for mother's insurance benefits, or was entitled to wife's insurance benefits on the basis of the wages and self-employment income of such individual for the month preceding the month in which he died,

"(E) at the time of filing such application has in her care a child or such individual entitled to a child's insurance benefit, and

"(F) in the case of a surviving divorced mother—

"(i) the child referred to in subparagraph (E) is her son, daughter, or legally adopted child, and

"(ii) the benefits referred to in such subparagraph are payable on the basis of such individual's wages and self-employment income,

"shall (subject to subsection (s) of this section) be entitled to a mother's insurance benefit for each month, beginning with the first month after August 1950 in which she becomes so entitled to such insurance benefits and ending with the month preceding the first month in which any of the following occurs: no child of such deceased individual is entitled to a child's insurance benefit, such widow or surviving divorced mother becomes entitled to an old-age insurance benefit equal to or exceeding three-fourths of the primary insurance amount of such deceased individual, she becomes entitled to a widow's insurance benefit, she remarries, or she dies. Entitlement to such benefits shall also end, in the case of a surviving divorced mother, with the month immediately preceding the first month in which no son, daughter, or legally adopted child of such surviving divorced mother is entitled to a child's insurance benefit on the basis of the wages and self-employment income of such deceased individual."

Section 216 (d) (3), 42 U. S. C. § 416 (d) (3), states:

"(3) The term 'surviving divorced mother' means a woman divorced from an individual who has died, but only if (A) she is the mother of his

of these benefits a misnomer. There we held that the provision of such benefits only to women violated the Due Process Clause of the Fifth Amendment.

Norman W. Boles died in 1971. He left a widow, Nancy L. Boles, and their two children, who were each promptly awarded child's insurance benefits. Nancy Boles receives mother's insurance benefits. Appellee Gonzales lived with Norman W. Boles for three years before his marriage to Nancy Boles and bore a son by him, Norman J. Boles.[6] Gonzales sought mother's insurance benefits for herself and child's benefits for her son. Her son was granted benefits, but her personal request was denied because she had never been married to the wage earner.

Gonzales exhausted her administrative remedies and then filed this suit in the United States District Court for the Western District of Texas. The District Court certified a class of "all illegitimate children and their mothers who are presently ineligible for Mother's Insurance Benefits solely because 42 U. S. C. § 402 (g)(1) restricts such benefits to women who were once married to the fathers of their children." App. to Juris. Statement 1a–2a. The District Court found that § 202 (g)(1) of the SSA was unconstitutional. There were three steps in its logic.

First, it read *Weinberger* v. *Wiesenfeld, supra,* as holding that mother's insurance benefits are chiefly for the benefit of the child. It quoted from a passage in that opinion where this Court observed:

"[Section] 402 (g), linked as it is directly to responsibility for minor children, was intended to permit women to elect

son or daughter, (B) she legally adopted his son or daughter while she was married to him and while such son or daughter was under the age of 18, (C) he legally adopted her son or daughter while she was married to him and while such son or daughter was under the age of 18, or (D) she was married to him at the time both of them legally adopted a child under the age of 18."

[6] Norman W. Boles had acknowledged his paternity of Norman J. Boles.

not to work and to devote themselves to the care of children. . . .

"That the purpose behind § 402 (g) is to provide children deprived of one parent with the opportunity for the personal attention of the other could not be more clear in the legislative history." 420 U. S., at 648–649.

On the basis of this language it then concluded that for purposes of equal protection analysis, the pertinent discrimination in this case is not unequal treatment of unwed mothers, but rather discrimination against illegitimate children. In its final step the District Court held that the application of § 202 (g)(1) at issue here is unconstitutional, relying on cases of this Court invalidating on constitutional grounds legislation that discriminated against illegitimates solely because of their status at birth. *E. g., Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Gomez* v. *Perez,* 409 U. S. 535 (1973); *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *Trimble* v. *Gordon,* 430 U. S. 762 (1977).

We noted probable jurisdiction, 439 U. S. 1126 (1979), and now conclude that the District Court incorrectly analyzed the equal protection issue in this case. We accordingly reverse.

As this Court noted in *Weinberger* v. *Wiesenfeld, supra,* at 643, § 202 (g) "was added to the Social Security Act in 1939 as one of a large number of amendments designed to 'afford more adequate protection to the family as a unit.' H. R. Rep. No. 728, 76th Cong., 1st Sess., 7 (1939)." The benefits created in 1939 "were intended to provide persons dependent on the wage earner with protection against the economic hardship occasioned by loss of the wage earner's support." *Califano* v. *Jobst,* 434 U. S., at 50; see *Mathews* v. *De Castro,* 429 U. S. 181, 185–186 (1976). Specifically, § 202 (g) "was intended to permit women [and now men] to elect not to work and to devote themselves to care of children." 420 U. S., at 648. The animating concern was the economic dislocation that occurs when the wage earner dies and the sur-

viving parent is left with the choice to stay home and care for the children or to go to work, a hardship often exacerbated by years outside the labor force. "Mother's insurance benefits" were intended to make the choice to stay home easier. But the program was not designed to be, and we think is not now, a general system for the dispensing of child-care subsidies.[7] Instead, Congress sought to limit the category of beneficiaries to those who actually suffer economic dislocation upon the death of a wage earner and are likely to be confronted at that juncture with the choice between employment or the assumption of full-time child-care responsibilities.

In this light there is an obvious logic in the exclusion from § 202 (g) of women or men who have never married the wage earner. "Both tradition and common experience support the conclusion that marriage is an event which normally marks an important change in economic status." *Califano* v. *Jobst, supra,* at 53. Congress could reasonably conclude that a woman who has never been married to the wage earner is far less likely to be dependent upon the wage earner at the time of his death. He was never legally required to support her and therefore was less likely to have been an important source of income. Thus, the possibility of severe economic dislocation upon his death is more remote.

We confronted an analogous classification in *Mathews* v. *De Castro, supra,* which involved a challenge to the exclusion of divorced women from "wife's income benefits." In concluding that the classification did not deny equal protection, we observed:

"Divorce by its nature works a drastic change in the economic and personal relationship between a husband

---

[7] *Califano* v. *Jobst,* 434 U. S., at 52:

"The statute is designed to provide the wage earner and the dependent members of his family with protection against the hardship occasioned by his loss of earnings; it is not simply a welfare program generally benefiting needy persons."

See also *Mathews* v. *De Castro,* 429 U. S., at 185–186.

and wife. . . . Congress could have rationally assumed that divorced husbands and wives depend less on each other for financial and other support than do couples who stay married. The problems that a divorced wife may encounter when her former husband becomes old or disabled may well differ in kind and degree from those that a woman married to a retired or disabled husband must face. . . . She may not feel the pinch of the extra expenses accompanying her former husband's old age or disability. . . . It was not irrational for Congress to recognize this basic fact in deciding to defer monthly payments to divorced wives of retired or disabled wage earners until they reach the age of 62." 429 U. S., at 188–189.

Likewise, *Weinberger* v. *Salfi,* 422 U. S. 749 (1975), upheld a 9-month duration-of-relationship eligibility requirement for the wife and stepchildren of a deceased wage earner. The stated purpose of the requirement was "to prevent the use of sham marriages to secure Social Security payments." *Id.,* at 767. We found that the only relevant constitutional argument was whether "the test [appellees could not] meet [was] not so rationally related to a legitimate legislative objective that it [could] be used to deprive them of benefits available to those who [did] satisfy that test." *Id.,* at 772. We recognized that the statutory requirement would deny benefits in some cases of legitimate, sincere marriage relationships.

"While it is possible to debate the wisdom of excluding legitimate claimants in order to discourage sham relationships, and of relying on a rule which may not exclude some obviously sham arrangements, we think it clear that Congress could rationally choose to adopt such a course. Large numbers of people are eligible for these programs and are potentially subject to inquiry as to the validity of their relationships to wage earners. . . . Not only does the prophylactic approach thus obviate the

necessity for large numbers of individualized determinations, but it also protects large numbers of claimants who satisfy the rule from the uncertainties and delays of administrative inquiry into the circumstances of their marriages." *Id.*, at 781–782.

It is with this background that we must analyze what the District Court in this case perceived to be the flaw in relying on dependence as a rationale for the statutory distinction between married and unmarried persons. The District Court pointed out that in 1972 Congress lifted the requirement that divorced women seeking mother's insurance benefits show that they were in some measure dependent on the wage earner immediately before his death.[8] It seized this fact as refutation of any characterization of these benefits as an attempt to ease the dislocation of those who had been dependent on the deceased. We think the District Court is demanding a precision not warranted by our cases.

Certainly Congress did not envision such precision. The legislative history surrounding the devolution of support requirements suggests that its effect on mother's insurance benefits was an incidental and relatively minor byproduct of

---

[8] Originally, nothing similar to mother's insurance benefits for divorced women was provided by the SSA. Then in 1950 these benefits, subject to limitations not relevant here, were made available to a surviving divorced wife, if she had not remarried, had a child in her care entitled to child's insurance benefits, and at the time of the wage earner's death had been receiving at least one-half of her support from him. Act of Aug. 28, 1950, § 101 (a), 64 Stat. 485.

In 1965, the remarriage bar to mother's insurance benefits was relaxed. A woman's rights as a surviving divorced mother would be restored if her second marriage ended in divorce. Moreover, a showing that she was receiving or entitled to receive "substantial contributions" from the wage earner at the time of his death would suffice in lieu of a showing that she received at least one-half of her support from the wage earner. Old-Age, Survivors, and Disability Amendments of 1965, § 308, 79 Stat. 377–379.

Finally, in 1972 Congress made the changes discussed by the District Court. Social Security Amendments of 1972, § 114 (c), 86 Stat. 1348.

Congress' core concern: older women who were married to wage earners for over 20 years—women who often only knew work as housewives—and who were not eligible for surviving divorced wife's insurance benefits because state divorce laws did not permit alimony or because they had accepted a property settlement in lieu of alimony.[9]   The Social Security laws

---

[9] Interestingly, younger women receiving mother's benefits are not even mentioned in the Committee Reports on the 1972 amendment.

"Benefits, under present law, are payable to a divorced wife age 62 or older and a divorced widow age 60 or older if her marriage lasted at least 20 years before the divorce, and to a surviving divorced mother. In order to qualify for any of these benefits a divorced woman is required to show that: (1) she was receiving at least one-half of her support from her former husband; (2) she was receiving substantial contributions from her former husband pursuant to a written agreement; or (3) there was a court order in effect providing for substantial contributions to her support by her former husband.

"In some States the courts are prohibited from providing for alimony, and in these States a divorced woman is precluded from meeting the third support requirement. Even in States which allow alimony, the court may have decided at the time of the divorce that the wife was not in need of financial support.  Moreover, a divorced woman's eligibility for social security benefits may depend on the advice she received at the time of her divorce.  If a woman accepted a property settlement in lieu of alimony, she could, in effect, have disqualified herself for divorced wife's, divorced widow's, or surviving divorced mother's benefits.

"The intent of providing benefits to divorced women is to protect women whose marriages are dissolved when they are far along in years—particularly housewives who have not been able to work and earn social security protection of their own.  The committee believes that the support requirements of the law have operated to deprive some divorced women of the protection they should have received and, therefore, recommends that these requirements be eliminated.  The requirement that the marriage of a divorced wife or widow must have lasted for at least 20 years before the divorce would not be changed."  S. Rep. No. 92–1230, p. 142 (1972).

See H. R. Rep. No. 92–231, pp. 54–55 (1971).  When the 1965 changes were made there was only passing mention of younger women receiving mother's insurance benefits.  S. Rep. No. 404, 89th Cong., 1st Sess., 108 (1965).

have maintained uniform support requirements for divorced wife's, divorced widow's, and surviving divorced mother's benefits. Obviously administration is thereby simplified. Undoubtedly, some younger divorced wives with children of deceased wage earners in their care who could not meet the old support requirements incidentally benefit from Congress' concern that many older women were being victimized once by state divorce laws and again by the Social Security laws.[10] However, when Congress seeks to alleviate hardship and inequity under the Social Security laws, it may quite rightly conceive its task to be analogous to painting a fence, rather than touching up an etching. We have repeatedly stated that there is no constitutional requirement that "a statutory provision . . . filte[r] out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute." *Weinberger* v. *Salfi,* 422 U. S., at 777; *Mathews* v. *De Castro,* 429 U. S., at 189. In sum, we conclude that the denial of mother's insurance benefits to a woman who never married the wage earner bears a rational relation to the Government's desire to ease economic privation brought on by the wage earner's death.

But the appellees argue that to characterize the problem in this fashion is to miss the point because at root this case involves discrimination against illegitimate children. Quite naturally, those who seek benefits denied them by statute will frame the constitutional issue in a manner most favorable to their claim. The proper classification for purposes of equal

---

[10] There are no precise figures as to the extra cost to the insurance fund posed by this expansion of mother's insurance benefits. It can be inferred from the attention this expansion received in the legislative history that its cost was a relatively small part of the $23 million annual increase in benefits estimated for eliminating support requirements across the board. See S. Rep. No. 92–1230, *supra,* at 142. The Department of Health, Education, and Welfare has estimated that compliance with the District Court's decision in this case will cost $60 million annually.

protection analysis is not an exact science, but scouting must begin with the statutory classification itself. Only when it is shown that the legislation has a substantial disparate impact on classes defined in a different fashion may analysis continue on the basis of the impact on those classes.

We conclude that the legislation in this case does not have the impact on illegitimates necessary to warrant further inquiry whether § 202 (g) is the product of discriminatory purposes. See *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979). "Mother's insurance benefits" are distinct from "child's insurance benefits." The latter are benefits paid to the minor children of the deceased wage earner [11] and, as noted, Gonzales' son did receive child's insurance benefits. The benefit to a child as a result of the parent or guardian's receipt of mother's insurance benefits is incidental: mother's insurance benefit payments do not vary with the number of children within the recipient's care, they are not available in the foster care context, and they are lost on remarriage or if the surviving parent earns a substantial income—all despite the needs of the child. Thus, the focus of *these* benefits is on the economic dilemma of the surviving spouse or former spouse; the child's needs as such are addressed through the separate child's insurance benefits.[12] Nor

---

[11] In *Jimenez* v. *Weinberger*, 417 U. S. 628 (1974), this Court struck down an absolute bar to child's insurance benefits for illegitimate children whose paternity had never been acknowledged or affirmed by evidence of domicile with, or support by, the wage earner before the onset of the disability.

[12] There is obviously a significant difference between this interpretation of the statutory purpose and that subscribed to by the author of this opinion in his separate concurrence in *Weinberger* v. *Wiesenfeld*, 420 U. S., at 655. To the extent that these interpretations conflict, the author feels he can do no better than quote Mr. Justice Jackson, concurring in *McGrath* v. *Kristensen*, 340 U. S. 162, 177–178 (1950):

"Precedent, however, is not lacking for ways by which a judge may recede from a prior opinion that has proven untenable and perhaps misled others. See Chief Justice Taney, *License Cases*, 5 How. 504, recanting views he

is it invariably true that whatever derivative benefits are enjoyed by the child whose parent or guardian receives mother's insurance benefits will not be enjoyed by illegitimate children. If the illegitimate child is cared for by the deceased wage earner's wife, she will receive mother's insurance benefits even though she has no natural children of her own and never adopted the child.[13] And many legitimate children live in households that are not headed by individuals eligible for mother's benefits.

In order to make out a disparate impact warranting further scrutiny under the Due Process Clause of the Fifth Amendment, it is necessary to show that the class which is purportedly discriminated against consequently suffers significant deprivation of a benefit or imposition of a substantial burden. If the class of beneficiaries were expanded in the fashion pressed by appellees, the beneficiaries, in terms of those who would exercise dominion over the benefits and whose freedom of choice would be enhanced thereby, would be unwed mothers, not illegitimate children. Certainly every governmental benefit has a ripple effect through familial relationships and the economy generally, its propagation determined by the proximity and sensibilities of others. Possibly the largest class of incidental beneficiaries are those who are gratified in a nonmaterial way to see a friend or relative re-

had pressed upon the Court as Attorney General of Maryland in *Brown* v. *Maryland,* 12 Wheat. 419. Baron Bramwell extricated himself from a somewhat similar embarrassment by saying, 'The matter does not appear to me now as it appears to have appeared to me then.' *Andrews* v. *Styrap,* 26 L. T. R. (N. S.) 704, 706. And Mr. Justice Story, accounting for his contradiction of his own former opinion, quite properly put the matter: 'My own error, however, can furnish no ground for its being adopted by this Court . . . .' *United States* v. *Gooding,* 12 Wheat. 460, 478. . . . If there are other ways of gracefully and good-naturedly surrendering former views to a better considered position, I invoke them all."

[13] Compare 42 U. S. C. § 402 (g) (1) (E) with § 402 (g) (1) (F) (i).

ceive benefits. Some limits must be imposed for purposes of constitutional analysis, and we conclude that in this case the incidental and, to a large degree, speculative impact on illegitimates as a class is not sufficient to treat the denial of mother's insurance benefits to unwed mothers as discrimination against illegitimate children.

The SSA and its amendments are the product of hard choices and countervailing pressures. The desire to alleviate hardship wherever it is found is tempered by the concern that the social security system in this country remain a contributory insurance plan and not become a general welfare program. General welfare objectives are addressed through public assistance legislation. In light of the limited resources of the insurance fund, any expansion of the class of beneficiaries invariably poses the prospect of reduced benefits to individual claimants. We need look no further than the facts of this case for an illustration. The benefits available to Norman W. Boles' beneficiaries under the Act are limited by his earnings record. The effect of extending benefits to Gonzales will be to reduce benefits to Nancy Boles and her children by 20%.[14]   Thus, the end result of extending benefits to Gonzales may be to deprive Nancy Boles of a meaningful choice between full-time employment and staying home with her children, thereby undermining the express legislative purpose of mother's insurance benefits. We think Congress could rationally choose to concentrate limited funds where the need is likely to be greatest.

Because of our disposition of the Fifth Amendment issue, we need not and do not reach the appellant's other arguments: that the District Court improperly certified a nationwide class that included individuals who were not shown to have met the jurisdictional requirements of § 205 (g) of the

---

[14] Brief for Appellant 29 n. 22.

SSA, 42 U. S. C. § 405 (g),[15] and that sovereign immunity barred that court's award of retroactive monetary relief.

The judgment of the District Court is accordingly

*Reversed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE BLACKMUN join, dissenting.

The critical question in this dispute is whether § 202 (g) of the Social Security Act, 42 U. S. C. § 402 (g), discriminates against unmarried parents or against illegitimate children. The Court determines that the intended beneficiaries of § 202 (g) are dependent spouses, and that the statute therefore distinguishes between categories of parents. Having thus characterized the statute, the Court concludes that the use of marital status as an index of dependency on a deceased wage earner is permissible under *Califano* v. *Jobst,* 434 U. S. 47, 50 (1977), and *Mathews* v. *De Castro,* 429 U. S. 181, 185–186 (1976). If, however, as the District Court found, the statute benefits children, then it incorporates a distinction based on legitimacy which must be tested under the more rigorous standards of *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974), and *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972).

Determining the proper classification for purposes of equal protection analysis is, to be sure, not "an exact science." *Ante,* at 294. But neither is it an exercise in statutory revision. And only by disregarding the clear legislative history, structure, and effect of the Mother's Insurance Benefits Program can the Court characterize dependent spouses, rather than children, as the intended beneficiaries of § 202 (g). Just four Terms ago, a unanimous Court concluded that the clear purpose underlying § 202 (g) "is to provide children deprived of one parent with the opportunity for the personal attention

---

[15] See *Califano* v. *Yamasaki,* 442 U. S. 682 (1979).

of the other." *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648–649 (1975).[1] Indeed, the author of today's opinion for the Court concurred separately in *Wiesenfeld* on the ground that an examination of the legislative history and statutory context of § 202 (g) "convincingly demonstrates that the *only* purpose of [§ 202 (g)] is to make it possible for children of deceased contributing workers to have the personal care and attention of a surviving parent." 420 U. S., at 655 (REHNQUIST, J., concurring) (emphasis added). That same legislative history and statutory context now persuade the Court that the "animating concern" of § 202 (g) is to assist a surviving spouse, and that any benefit to a child is merely "incidental." *Ante,* at 288–289, 294. I cannot agree. In my judgment, the history and structure of the Act establish as "convincingly" here as they did in *Wiesenfeld* that § 202 (g) was designed to aid children. And because denial of support for illegitimates bears no substantial relationship to that purpose, I respectfully dissent.

I

The Court concedes, as it must, that Congress intended the Mother's Insurance Benefits Program to enable surviving spouses to stay at home and care for their children. *Ante,* at 288. Despite this concession, the Court manages to conclude that the sole beneficiaries of the program, for equal protection purposes, are the spouses who provide care, not the children who receive it. Unencumbered by any direct support from the legislative history, the Court reaches this conclusion by positing that the program was designed to aid surviving parents who "actually suffer economic dislocation upon the death of a wage earner." *Ante,* at 289. Given this asserted pur-

---

[1] In *Wiesenfeld,* the Court held that § 202 (g)'s denial of benefits to widowers reflected impermissible gender-based discrimination. In so ruling, we reasoned that classifications based on the sex of the surviving parent bore no relationship to the statutory objective of enabling children who had lost one parent to receive full-time care by the other. See 420 U. S., at 651.

pose, the Court finds "obvious logic" in § 202 (g)'s exclusion of unwed mothers, since "Congress could reasonably conclude that a woman who has never been married to the wage earner is far less likely to be dependent upon the wage earner at the time of his death." *Ante,* at 289. However, neither the history nor structure of the statute supports the Court's determination that Congress enacted § 202 (g) to assist dependent spouses rather than their children.

Aid to surviving parents was first extended under the Social Security Act Amendments of 1939 in the form of "widows' benefits." The Advisory Council on Social Security, which formulated the program, indicated that payments were "intended as supplements to the orphans' benefits with the purpose of enabling the widow to remain at home and care for the children." Final Report of the Advisory Council on Social Security 31 (1938). Proposals to grant benefits to dependent widows without minor children were rejected, on the apparent theory that young childless women could work and older widows would have savings or grown children able to assist them. Report of the Social Security Board, H. R. Doc. No. 110, 76th Cong., 1st Sess., 7–8 (1939). See also H. R. Rep. No. 728, 76th Cong., 1st Sess., 36–37 (1939); Hearings on the Social Security Act Amendments of 1939 before the House Committee on Ways and Means, 76th Cong., 1st Sess., 61 (1939). Subsequent re-enactments of the program reflected no change in the underlying statutory objective—to allow surviving parents "to stay home and care for [their] children instead of working." 1971 Advisory Council on Social Security, Reports on the Old-Age, Survivors, and Disability Insurance and Medicare Programs 30 (1971).

Moreover, the entire structure of the statute belies the Court's determination that Congress intended mother's insurance to aid a wage earner's economically dependent spouse rather than his children. Section 202 (g) imposes no express requirement of dependency. As the District Court noted,

mothers and their legitimate children may obtain benefits under § 202 (g) "regardless of whether [the wage earner] was living with them or supporting them at the time of his death, or even if he never lived with or supported them." 464 F. Supp. 408, 412 (WD Tex. 1978). By contrast, an unmarried mother and her child who were fully dependent on the insured nonetheless remain ineligible for assistance under § 202 (g). That divorced parents and their children qualify for mother's insurance further undercuts the Court's attempted linkage between the marital requirement and dependency. A woman previously married to a deceased wage earner is eligible for benefits even if neither she nor her child ever received support from the father, and even if the father was excused from any legal support obligations in the divorce proceedings. Indeed, a mother whose second marriage terminates in death or divorce may claim benefits on the account of her first husband although in all likelihood, any entitlement to support terminated upon her remarriage. See 464 F. Supp., at 413.[2] In short, nothing in the structure or history of the statute sustains the Court's conclusion that the purpose of § 202 (g) is to benefit dependent spouses as opposed to children.

Equally untenable is the Court's further determination that § 202 (g) has insufficient discriminatory impact on illegitimates to warrant further analysis. See *ante,* at 294. In con-

---

[2] The Court dismisses this awkward fact with an equally awkward metaphor. In the Court's view, Congress' inclusion of divorced parents represents an attempt to "alleviate hardship and inequity under the Social Security laws." *Ante,* at 293. And, under the Court's analysis, when Congress undertakes such an endeavor, "it may quite rightly conceive its task to be analogous to painting a fence, rather than touching up an etching." *Ibid.* But this characterization of legislative technique elides the issue relevant here, the purpose of the statutory scheme. Metaphor cannot mask the significance of Congress' decision to confer benefits on divorced spouses. That these individuals may obtain mother's insurance of itself negates the proposition that the painter-draftsman was concerned with assisting dependent parents rather than their children.

cluding that § 202 (g) has no such disparate effect, the Court reasons first that

> "[t]he benefit to a child as a result of the parent or guardian's receipt of mother's insurance benefits is incidental: mother's insurance benefit payments do not vary with the number of children within the recipient's care, they are not available in the foster care context, and they are lost on remarriage or if the surviving parent earns a substantial income . . . ." *Ante,* at 294.

But none of these enumerated eligibility requirements support the Court's characterization of children as "incidental" rather than intended beneficiaries of § 202 (g). On the contrary, these restrictions, together with two others the Court neglects to mention, are consistent with the stated purpose of the program—to afford parents who would otherwise be forced to work the option of caring for their children at home. That objective is plainly served by eligibility limitations excluding individuals whose economic resources already permit such a choice. Factors including remarriage, outside income, and qualification for foster care payments directly or indirectly reflect such resources; the number of the recipient's children does not. Similarly, the conditions that mother's benefits cease when a child reaches 18 or leaves the parent's care and custody, see § 202 (d)(5), 42 U. S. C. § 402 (d)(5), also reinforce the conclusion that children are the actual beneficiaries of § 202 (g). For the parent's eligibility continues "only so long as it is realistic to think that the children might need their parent at home." *Weinberger* v. *Wiesenfeld,* 420 U. S., at 650 n. 17.

The Court further submits that the discriminatory impact of § 202 (g) is not of constitutional dimension because an illegitimate child could conceivably obtain benefits if he leaves the home of his natural mother to live with his deceased father's wife. This suggestion, of course, presupposes both an extraordinary beneficence on the part of the wife, and no

strong attachment between the natural mother and her child, assumptions which the Court does not and could not defend.[3] And forcing a child to forgo living with his natural mother in order to obtain assistance under § 202 (g) hardly comports with the articulated purpose of the program, to encourage parental care.

In any event, as this Court's prior holdings amply demonstrate, a statute that disadvantages illegitimates as a class is not saved simply because not all members of that class are penalized under all conceivable circumstances. For example, in both *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972), and *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974), we rejected an argument that illegitimates suffered no discrimination under statutes extending benefits to legitimate children but only to certain categories of illegitimates.[4] Similarly, in

---

[3] Although statistics in this area are difficult to obtain, available data reveal that a very high percentage of illegitimate children reside with their natural mothers. Approximately one-half of all illegitimate births are to women under age 20, see Department of Health, Education, and Welfare, Monthly Vital Statistics Report, Final Natality Statistics, 1977, p. 19 (Feb. 1979), and studies indicate that between 86% and 93% of these mothers are living with their children. See Report by the Alan Guttmacher Institute, Research and Development Division of the Planned Parenthood Federation of America, 11 Million Teenagers 11 (1976) (hereinafter cited as Planned Parenthood Report); F. Furstenberg, Unplanned Parenthood 174 (1966) (hereinafter cited as Furstenberg); Zelnik & Kantner, the Resolution of Teenage First Pregnancies, 6 Family Planning Perspectives 77 (1974) (Table 5). Comparable figures have been reported for mothers over age 20. See Wisconsin Department of Health and Social Services, Unmarried Mothers in Wisconsin, 1974 (1975) (Tables 11, 13). The remaining children are residing with either adoptive parents or other individuals. See Planned Parenthood Report 11; Furstenberg 174. One in-depth study found that the latter separations were generally attributable to the mother's illness or inability to obtain child care during hours of employment. *Ibid.*

[4] Under the workmen's compensation statute at issue in *Weber,* illegitimate children could recover benefits on the same basis as legitimates only if acknowledged by their fathers. See 406 U. S., at 167–168. *Jimenez* involved a statute granting disability insurance benefits to illegitimates

*Trimble* v. *Gordon,* 430 U. S. 762 (1977), the Court held unconstitutional a statute denying illegitimate children the right to inherit from their intestate fathers even though illegitimates whose fathers wrote wills were not disadvantaged by the provision. So too here, the Court cannot dismiss the discriminatory impact of § 202 (g) by a "hypothetical reshuffling of the facts," *Trimble* v. *Gordon, supra,* at 774, particularly one that disregards the very relationship between a surviving single parent and child which the statute was intended to foster.

Finally, the Court suggests that § 202 (g) does not disadvantage illegitimates in any constitutionally cognizable sense because it is surviving spouses, not their children, who "exercise dominion over the benefits and whose freedom of choice [is] enhanced thereby." *Ante,* at 295. However, that the parent makes the decision to stay at home does not render the child any less the beneficiary of that choice. As a practical matter, the parent also exercises "dominion" over the children's insurance benefits afforded by § 202 (d) of the Act, 42 U. S. C. § 402 (d), but the child is nonetheless the recipient. Children now become "incidental" and "speculative" beneficiaries of § 202 (g) only because the Court declares them to be so.

I would adhere to the understanding, unanimously expressed in *Wiesenfeld,* that the Mother's Insurance Program, both in purpose and effect, is a form of assistance to children. Thus, the statute's eligibility restrictions should be evaluated as they in fact operate, as discrimination based on legitimacy.

## II

Statutes that foreclose opportunities solely because of a child's status at birth represent a particularly invidious form

---

where: (1) state law permitted them to inherit from the wage earner; (2) their illegitimacy resulted from formal or nonobvious defects in their parents' marriage ceremony; (3) they had subsequently been legitimated; or (4) the disabled wage-earning parent had contributed to their support or had lived with them prior to disability. See 417 U. S., at 631, and n. 2.

of discrimination. *Gomez* v. *Perez,* 409 U. S. 535 (1973); *Levy* v. *Louisiana,* 391 U. S. 68 (1968). To penalize an illegitimate child for conduct he could not prevent and a status he cannot alter is both "illogical and unjust." *Weber* v. *Aetna Casualty & Surety Co., supra,* at 175. Accordingly, classifications based on legitimacy violate the equal protection requirements of the Fifth Amendment[5] unless they bear a close and substantial relationship to a permissible governmental interest. See *Jimenez* v. *Weinberger, supra,* at 637; *Mathews* v. *Lucas,* 427 U. S. 495, 509–510 (1976).

In arguing that § 202 (g) meets this test, the Secretary suggests that legitimate children as a class are more likely than illegitimates to be dependent on the insured wage earner at the time of his death. Therefore, because the statute establishes a maximum amount payable to any one wage earner's survivors, the Secretary contends that the exclusion of illegitimates is an appropriate means of allocating finite resources to those most likely to have suffered economically from the insured's death. Brief for Appellant 28.

The threshold difficulty with this argument is that § 202 (g)'s marital restriction bars recovery by illegitimates regardless of whether any other individuals are eligible to claim benefits on a particular wage earner's account. Thus, the restriction defended here as a rationing device withholds assistance to illegitimates even when there are no competing claimants among whom to ration. Insofar as the exclusion of illegitimates is designed to allocate limited funds on the basis of need, it is not carefully tailored to achieve that objective. See *Trimble* v. *Gordon, supra,* at 770–771; *Gomez* v. *Perez, supra,* at 538.[6]

---

[5] See *Vance* v. *Bradley,* 440 U. S. 93, 94–95, n. 1 (1979); *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954).

[6] That Congress has established a maximum which cannot fully provide for all survivors affords no basis for preferring legitimate children over dependent illegitimates. See *Weber* v. *Aetna Casualty & Surety Co.,* 406

But even if § 202 (g)'s marital restriction operated only in contexts of multiple claimants, it could not withstand scrutiny under *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972), and *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974). In both those cases, the Court recognized that the marital status of parents is not a sufficiently accurate index of the economic needs of their children to warrant conclusively denying assistance to illegitimates. At issue in *Weber* was a workmen's compensation scheme which provided that unacknowledged illegitimate children could recover on the account of an insured only if payments to other eligible claimants did not exhaust the maximum allowable benefits. Noting that an unacknowledged illegitimate child "may suffer as much from the loss of a parent as a child born within wedlock," 406 U. S., at 169, the Court declined to view status at birth as an adequate proxy for economic dependence. See also *Richardson* v. *Griffin,* 409 U. S. 1069 (1972), summarily aff'g 346 F. Supp. 1226 (Md.); *Richardson* v. *Davis,* 409 U. S. 1069 (1972), summarily aff'g 342 F. Supp. 588 (Conn.). Again in *Jimenez* v. *Weinberger,* we struck down a statute granting social security benefits to a disabled worker's legitimate children born after the onset of disability but not to afterborn illegitimate children except under certain limited circumstances. See n. 4, *supra.* The constitutional infirmities identified in *Jimenez* are equally evident in this case; that statute, like § 202 (g), was overinclusive to the extent it aided legitimate children not actually dependent on the insured wage earner, and underinclusive to the extent it withheld assistance from illegitimate children who were in fact dependent. And here, as in *Jimenez,* it serves no purpose consistent with the aims of the Social Security Act to deny illegitimates all op-

U. S. 164, 175–176 (1972); *Richardson* v. *Griffin,* 409 U. S. 1069 (1972), summarily aff'g 346 F. Supp. 1226 (Md.); *Richardson* v. *Davis,* 409 U. S. 1069 (1972), summarily aff'g 342 F. Supp. 588 (Conn.).

portunity to establish their dependence and their concomitant right to insurance benefits. See 417 U. S., at 636.[7]

We cannot, of course, expect perfect congruence between legislative ends and means in the administration of a complex statutory scheme. See *ante,* at 284–285. But neither should we give our imprimatur to distinctions needlessly predicated on a disfavored social status, particularly one beyond an individual's power to affect. Although a "blanket and conclusive exclusion" of illegitimate children may be an administratively expedient means of screening for dependence under § 202 (g), see *Jimenez* v. *Weinberger, supra,* at 636, it is also inaccurate, unjust, and, under this Court's settled precedents, unconstitutional.

I respectfully dissent.

---

[7] Unlike the statute upheld in *Mathews* v. *Lucas,* 427 U. S. 495 (1976), which presumed the dependence of legitimate children but required proof of dependence by illegitimates, § 202 (g) conclusively bars recovery even to those illegitimates who could establish that they were supported by the deceased wage earner at the time of his death.