William D. MARTIN, Petitioner,

v.

**DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.**

No. 85–1645.

District of Columbia Court of Appeals.

Argued Oct. 30, 1986.
Decided Oct. 13, 1987.

---

Robert Cadeaux, with whom Jay R. Goldman was on the brief, for petitioner.

Charlotte Brookins–Pruitt, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, at the time the brief was filed, and Charles L. Reischel, Deputy

Corp. Counsel, were on the brief, for respondent.

Before MACK, FERREN, and ROGERS, Associate Judges.

FERREN, Associate Judge:

Petitioner William D. Martin asks for review of an order of the Police and Firefighters Retirement and Relief Board (Board) denying his application for disability retirement from the Metropolitan Police Department. The Board concluded that Martin's physical injuries to his wrist and hand did not disable him "for useful and efficient service in the grade or class of position last occupied." D.C.Code § 4–607(2) (1981); see id. § 4–616(a). The Board's ruling was not "in accordance with law," id. § 1–1510(a)(3)(A) (1987 Replacement), for the Board failed to make a specific finding that Martin's assigned work is "useful and efficient" service to his department. Martin's testimony raised this issue, and thus we remand for the Board to determine whether Martin has been disabled for service that is both useful and efficient, given the department's needs and Martin's capabilities.

## I.

Martin joined the Metropolitan Police force in 1965. He had attained the rank of sergeant in February 1979 when he was shot in the wrist while attempting to execute a search warrant. During the four years following his injury, Martin underwent four operations to repair his damaged left wrist and to mitigate the pain he continued to experience. He sporadically performed some form of limited duty between April 1980 and his fourth operation in April 1983, when he went on extended sick leave. Since August 1985, Martin has performed a variety of light duty tasks with the police department.

Martin first applied for disability retirement in 1982. Although his wound had permanently disabled him from returning to full duty, the Board found Martin capable of performing a useful and efficient light duty alternative and, accordingly, denied his claim. Martin applied a second time for disability retirement in June 1984, but, because the Board found that Martin had presented no new evidence, the Board again denied his claim. When his doctors indicated that Martin's condition had grown worse, he sought disability retirement a third time in October 1985. It is the denial of this claim that Martin now appeals. The decision and its evidentiary bases are set forth in the Board's "Findings of Fact, Conclusions of Law, and Decision" (Decision) dated November 18, 1985.

At Martin's October 1985 hearing, the Board received evidence from a variety of sources. Dr. Cornelius Frey had examined Martin more than forty times since his injury and had performed all four operations on Martin's hand. Dr. Frey testified that, while Martin retained limited use of the fingers in his left hand, his thumb and index finger were seriously impaired, his wrist and long finger were partially impaired, and permanent neromas in his hand caused acute pain when triggered by contact. The result, according to Dr. Frey, was a permanent 50% disability of the left hand. Dr. Samuel Q. Mitchell also testified about his examinations of Martin and concluded that the functional impairment of Martin's hand, together with the painful neromas, rendered Martin disabled from even limited duty.

Additional medical evidence came from various letters and reports written by Dr. Frey, Dr. Joseph D. Linehan, and the Board of Police and Fire Surgeons (Board of Surgeons). Dr. Linehan had examined Martin in 1984 and concluded that Martin's wrist rendered him "incapable of light duty as a policeman." In contrast, the Board of Surgeons, which reviews disability cases before they are heard by the Board, opined in its Summary Medical Report that Sergeant Martin, while "permanently disabled with a functional impairment of 20%," could "perform limited duty." The report was signed by Drs. Balkissoon and Chin-Lee, neither of whom had examined Martin at any time. It referred generally to "Martin's medical history," as well as to a 1984 report by Dr. Linehan which had concluded that Martin was incapable of light-duty po-

lice work because he was able to use his left hand only as a "scoop." The Board of Surgeons also relied on a report by the police department's Internal Affairs Division which, as the surgeons interpreted it, tended to show that Martin could perform limited duty.

Non-medical evidence presented at the hearing concerned Martin's musical and domestic activities. The Board admitted into evidence the report of the Internal Affairs Division cited by the Board of Surgeons. The investigations chronicled in this report were apparently aimed at gathering evidence, first, about whether Martin was working for pay while on sick leave and, second, about whether Martin used his left hand in ways incompatible with his claim for disability retirement. Internal Affairs gathered information by sending officers to watch Martin sing with a night club band and to interview Martin's neighbors about how he used his left hand around the house. The report records the observations of five officers who watched Martin perform with the band; each reported various ways in which Martin used his left hand, such as to hold a microphone, push boxes, hold a glass, and grasp the hand of a woman with whom he danced. The report also states that one officer "observed a person whom he believed to be Sergeant Martin" pushing a power mower with both hands across the lawn of Martin's house. Finally, the report summarizes statements by two neighbors who acknowledged they had seen Martin sometimes mow his lawn or shovel snow. A third neighbor made statements tending to exonerate Martin of the lawn-mowing charge; he had seen only Martin's brother mowing the lawn for Martin. Neither the officers who elicited these statements nor the neighbors who spoke with the officers were called to testify at the hearing. Moreover, each of the neighbors had refused to sign written statements. The Internal Affairs Report was drafted by Sergeant Stanley E. Causey, the only officer of the five observers who testified at the hearing. The report was signed by Lieutenant Allen Smith, who had not participated in the observations or in the interviews of neighbors that are summarized in the report.

Martin was the final witness to testify. Based on his testimony, the Board established that Martin receives a salary of $33,700 per year. Martin also described his light duty assignments during the ten weeks since returning to work in August 1985. He stated that he had conducted twenty interviews of job applicants, each taking about fifteen minutes; he had conducted a morning roll call twice a week, requiring about ten minutes each time; he had managed disbursements of money from a special fund, requiring an average of about three or four minutes; he had ensured that police cruisers belonging to his division received needed maintenance, occupying "a couple of minutes" a day; and he had signed leave slips, at thirty seconds each. Martin said that he senses he is "slighted" in the department because of the little work he does. He added that he feels he does not contribute to the department and his colleagues.

The Board concluded that Martin was not disabled from "useful and efficient service" with the police department. It relied on (1) Dr. Frey's testimony that petitioner has full use of two fingers, partial use of two more, and some capacity to manipulate his thumb; (2) the Internal Affairs Report that Martin's injury has not affected his "musical and away-from-the-department activities in which the left hand is used unrestrictedly and without apparent pain;" and (3) the conclusion of the Board of Surgeons that Martin is capable of light duty. The Board's Decision ignores Dr. Mitchell's testimony. Interestingly, moreover, in relying on Dr. Frey's testimony, the Board expressly stated that Frey had "negate[d]" Dr. Linehan's "characterization of the left hand as being useful mainly as a 'scoop' "—a characterization which had supplied the only stated medical finding underlying the Board of Surgeons' conclusion that Martin could perform limited duty. Finally, the Board's decision makes no reference to the character of Martin's current light duty assignments and contains no finding that Martin's assigned work is "useful and efficient."

## II.

In reviewing a decision of the Board, we may reverse only if its findings are unsupported by substantial evidence in the record or if the decision is grounded on a mistaken legal premise or manifests an abuse of discretion. *See* D.C.Code § 1–1510(a)(3)(A) & (E) (1987 Replacement); *Neer v. District of Columbia Police & Firemen's Retirement & Relief Board,* 415 A.2d 523, 525–26 (D.C.1980). Martin argues that, on the evidence presented at the October 1985 hearing, the Board erred as a matter of law in concluding he is able to perform "useful and efficient service in the grade or class of position" he occupied before receiving the injuries on his wrist.

### A.

Because Martin was injured in the line of duty, he is entitled to disability retirement if his injury "permanently disables him for the performance of duty." D.C.Code § 4–416(a) (1981) (stating disability retirement criteria for officers who became members of the force before February 15, 1980). To be "disabled" means to be "disabled [1] for useful and efficient service [2] in the grade or class of position last occupied." *Id.* § 4–607(2). In *Wells v. Police & Firefighter's Retirement & Relief Board,* 459 A.2d 136, 139 (D.C.1983) (en banc), we held that an officer seeking retirement bears the burden of establishing that he or she is disabled according to these statutory criteria.

■ In interpreting the second requirement of § 4–607(2)—*i.e.,* for retirement, an applicant must be disabled for service "in the grade or class of position last occupied" —we have rejected the argument that an applicant is entitled to retire if disabled from performing his or her "old," full-duty job. *Seabolt v. Police & Firemen's Retirement & Relief Board,* 413 A.2d 908, 910–11 (D.C.1980). We have held, rather, that this statutory language broadly encompasses any of the jobs available to officers of the same rank and salary last held, and thus that retirement will be available only if the officer is incapable of performing any assigned light duty alternative to the previ-

ous job. *See Wells,* 459 A.2d at 138; *Seabolt,* 413 A.2d at 910–12. The "grade or class" requirement, therefore, places no meaningful restriction on the content of the jobs a partially disabled police officer may be required to perform. It merely ensures that an officer who is denied retirement may not suffer demotion and must be paid at his or her prior salary, whatever light duty job the officer is given. In the present case, Martin does not claim he has been demoted or now receives less than a full sergeant's salary.

At issue here, therefore, is the first statutory requirement of § 4–607(2): for retirement, an applicant must be disabled from performing "useful and efficient service" within the department. This requirement governs the content of the job a partially disabled officer may be required to perform instead of being permitted to retire on disability. To date, however, this court has had little occasion to interpret what this requirement means, other than to make clear, as a general proposition, that light duty alternatives to the full duties a petitioner previously performed can constitute "useful and efficient service." *See, e.g., Wells,* 459 A.2d at 138–39; *Echard v. Police & Firemen's Retirement & Relief Board,* 422 A.2d 1275 (D.C.1980).

### B.

■ The District urges that a department's very willingness to retain a partially disabled employee at full salary is legally sufficient to show that he or she provides "useful and efficient service," no matter what character or amount of work the employee actually performs. This argument is invalid.

First, the District's interpretation would deprive the statute's "useful and efficient service" language of all content, for it would allow the government to refuse to retire an employee who actually performed no work at all or whose job, while including some useful tasks, was obviously inefficient given the department's needs, personnel, and budget. As long as the statute permits retirement only to those disabled from useful and efficient service, but gives

those who are so disabled the right to retire on disability, the Board must consider objectively, by reference to evidence, whether the petitioner is actually performing useful and efficient service justifying a full time salary.

Second, the District's interpretation gives too great deference to the wishes of the departments in question. It is the members of the Board, not the heads of the police or fire departments, who determine whether a petitioner is eligible for disability retirement. Thus, in *Jones v. Police & Firemen's Retirement & Relief Board*, 375 A.2d 1, 5–6 (D.C.1977), we held that internal police regulations eliminating the light duty alternative for officers injured off-duty did not control whether employees who were capable of light duty were disabled and eligible for retirement under the Police and Firefighters Disability Act. The same applies to specific retirement decisions: although the department's needs and resources determine whether particular work is useful and efficient, and the department's judgment on the question should be accorded appropriate weight, the Board must find for itself, based on evidence from the petitioner and the department alike, that the department actually provides useful and efficient work for each partially disabled employee before it denies retirement.

Finally, the District's interpretation of "useful and efficient service" would provide no safeguard for disabled employees against overzealous application of the limits the law has placed on disability retirement. The rule that forbids disability retirement for employees who remain capable of delivering useful and efficient service prevents the waste and injustice of paying substantial annuities to persons who, although unable to perform the precise tasks they had undertaken before the injury or illness, can well perform different jobs in their departments. This rule, however, neither demands nor permits compelling partially disabled employees to assume artificial and substantially unproductive roles in their departments. Such application of the law would not only waste public funds but also demean disabled employees and sub-

ject them to the resentment of fellow workers. The requirement that disabled employees suffer no diminution of rank or salary itself serves to safeguard the dignity of employees disabled in the line of duty. Similarly, requiring the Board to find that light duty work allotted to a partially disabled officer is in fact useful and efficient to the department will also help insure that the demands of the disability retirement law do not in practice add insult to injury for partially disabled police officers and firefighters.

## ·C.

■ The District argues, alternatively, that, even assuming Martin's current light duty tasks fail to satisfy statutory criteria for usefulness and efficiency, he has not met his burden under *Wells* to show there is no *other* "useful and efficient" job or aggregation of tasks that he could perform for the department. Apparently, the District believes that, even if the police department is not taking useful and efficient advantage of Martin's limited capabilities, the Board's decision to deny disability retirement should not be disturbed unless and until a petitioner shows there is no other sergeant's work that he or she could perform if assigned. This approach suffers from three shortcomings.

First, there is no real difference between this argument and the contention, rejected earlier, that the District's mere willingness to keep Martin employed at full salary satisfies the "useful and efficient service" requirement. We do not understand how Martin could be called materially more "useful and efficient" to the department if there were tasks he was able to do, but not assigned to, than if no such tasks were available.

Second, if an employee, such as Martin, were required to prove there was no other sergeant's task that he could perform, it would be extremely difficult for that employee ever to meet the burden of proving that he cannot offer useful and efficient service to the department. The employee would have to negate a possibility, *i.e.*, the

availability of other tasks, that only the department itself is in a position to resolve. For this reason, the court stated in *Wells* that, realistically, an applicant for disability retirement "will be able to show that no appropriate [light duty] job is available if the Department fails to place and keep him [or her] employed in such a job." 459 A.2d at 139. This court thus recognized a feasible means by which a partially disabled employee could make a prima facie case, by reference to his or her own workload, that no "useful and efficient" work exists for one with his or her disability.

Third, the District's approach would render virtually irrelevant as evidence the light duty work a petitioner's department has seen fit to require; and yet, as the court recognized in *Wells*, the job a department has given a partially disabled employee is surely significant, if not conclusive, evidence of the work the department has available for a person with the particular capacities and disabilities of the employee in question.

### D.

■ The "useful and efficient service" requirement probably admits of no universal and absolute criteria. In *Wells* and earlier cases, this court has stressed that one means of meeting a petitioner's burden of establishing a disability that justifies retirement is to show that the department has failed to place and keep the petitioner in a job that he or she can perform in the grade or class of position last occupied. *See id.* at 139 & n. 3; *Woody v. Police & Firemen's Retirement & Relief Board,* 441 A.2d 987, 989 (D.C.1982) (per curiam); *Rzepecki v. Police & Firemen's Retirement & Relief Board,* 429 A.2d 1388, 1389, 1391 (D.C.1981) (Ferren, J., concurring). Similarly, the work a partially disabled employee has been given can be relevant evidence that the employee is disabled from "useful and efficient service." Here, Martin attempted to show that the department

had failed to place him in a useful and efficient position, and he presented evidence sufficient to raise the question whether the department had met its obligation to do so.

Martin has worked for ten weeks on light duty since returning from sick leave after his last operation. During that time the department has assigned to him a series of tasks that, according to his uncontradicted testimony, required in total about an hour to an hour and a half each week.[1] Presumably, each of these tasks individually is necessary to the department, but Martin has clearly made a prima facie case that, taken together, these tasks do not add up to "useful and efficient" service for an employee paid a full-time salary. No representative of the police department appeared at the hearing to rebut Martin's sworn testimony about the nature and duration of his assignments. Nor did anyone from the department attempt to demonstrate why such part-time tasks at a sergeant's full pay were "useful and efficient" to the department. The Board, however, did not address the question raised by Martin's testimony. Its failure to do so requires this court to reverse and remand for the Board to reach a determination as to whether Martin has been given work that amounts to "useful and efficient service" in light of the needs of the department and Martin's physical capabilities. Inherent in this analysis is a consideration of the expense of keeping Martin on the force, given that the department cannot reduce his salary.

On remand, the department, if it opposes Martin's disability retirement, may either (1) refute Martin's testimony about the nature and time requirements of the work he has been given, or (2) present evidence sufficient to convince the Board that the duties Martin performs are nonetheless useful and efficient, or (3) show, on the basis of medical and other evidence, that

---

1. Martin did say he thought he must have performed some other tasks in addition to those he could recall, and that he would have done more had the office been busier. Because of the extremely small quantity of work Martin could recall, his testimony, taken as a whole, provided evidence sufficient to shift the burden to the government to produce rebuttal testimony that he had performed efficient service.

Martin could undertake more onerous, available tasks that he has been willing to try since his injury. The Board must take care, however, to ensure that whatever tasks the department proposes to give Martin are duties he can perform without significant discomfort or an exacerbation of his current disability.

### III.

Martin claims the Board abused its discretion both by admitting into evidence the Summary Medical Report and the Internal Affairs Report and by barring his own introduction of a draft of the Summary Medical Report which Dr. Mitchell prepared but the Board of Surgeons rejected. We agree that the Summary Medical Report should not have been admitted into evidence, while portions of the Internal Affairs Report so lacked reliability as to indicate that the Board afforded them undue weight. We also agree that the Board unreasonably denied admission of the draft medical report.

### A.

Administrative hearings are not governed by the strict rules of evidence that regulate the flow of information at a court trial; thus, hearsay is generally admissible unless "irrelevant, immaterial, [or] unduly repetitious." D.C.Code § 1–1509(b) (1987 Replacement); see Jadallah v. District of Columbia Department of Employment Services, 476 A.2d 671, 676 (D.C.1984) (per curiam); Wallace v. District of Columbia Unemployment Compensation Board, 294 A.2d 177, 179 (D.C.1972). "Failure to apply these generous principles of admissibility can be a basis for reversal." Kopff v. District of Columbia Alcoholic Beverage Control Board, 381 A.2d 1372, 1385

(D.C.1977); see also Committee For Washington's Riverfront Parks v. Thompson, 451 A.2d 1177, 1184 (D.C.1982). On the other hand, the admission of hearsay evidence at administrative hearings must both satisfy a disability claimant's constitutional right to due process and comport with common law restrictions designed to ensure that hearsay evidence does not undermine the accuracy of administrative adjudications. Reversal may be warranted if an agency places undue confidence in hearsay evidence that is too unreliable to justify the weight given to it. Jadallah, 476 A.2d at 676–77.

We turn, first, to the Summary Medical Report. In Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Supreme Court ruled that hearsay medical reports are admissible and may constitute substantial evidence at hearings to determine eligibility for federal Social Security disability benefits when they are sufficiently reliable and probative to comport with the requirements of procedural due process. The Court concluded that

a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.[2]

91 S.Ct. 1420, 1427–30, 28 L.Ed.2d 842 (1971). Accordingly, such a report may be admissible, and may serve as substantial evidence supporting denial of benefits, when other factors suggest reliability, without regard to whether the author of the report is available to testify under cross-examination. See Califano v. Boles, 443 U.S. 282, 285 n. 4, 99 S.Ct. 2767, 2770 n. 4, 61 L.Ed.2d 541 (1979); 3 K. Davis, Administrative Law Treatise §§ 16:7–16:8 (2d ed. 1980).

**2.** There is an unresolved question under Perales: to what extent is the failure to exercise an opportunity to subpoena and cross-examine the physician-author of a hearsay medical report critical to the admissibility of that report and its substantiality as evidence? We believe Perales should be understood to say that a waiver of the right to call and cross-examine a medical witness is but one of a number of factors bearing on the admissibility of a hearsay medical report. See Richardson v. Perales, 402 U.S. 389, 402–07,

*Perales*, 402 U.S. at 402, 91 S.Ct. at 1427 (emphasis added). The Court stressed that its confidence in the reliability and probative value of the five medical reports at issue was derived from "a number of factors." *Id.* For example, the reports were prepared by physicians who had personally examined the claimant; the reports reflected an "impressive range" of examination, as well as considerable detail in their findings and reasoning; and the reports were not inconsistent with one another. *Id.* at 402–04, 91 S.Ct. at 1427–28.

The due process analysis in *Perales* also governs the use of hearsay medical reports at disability hearings under the Police and Firefighters' Disability Act, for the stakes and the medical issues are very much the same as those for disability determinations under the Social Security Act. *See id.*, at 390, 399–400, 91 S.Ct. at 1426–1427; *Dowd v. District of Columbia Police & Firefighters' Retirement & Relief Board*, 485 A.2d 212, 215 (D.C.1984) ("the *Perales* holding is dispositive of the evidentiary issue raised by petitioner," who had argued that written medical reports did not constitute substantial evidence in a disability retirement case).

 Unlike the situation in *Perales*, the Board in the present case did not rely on the Summary Medical Report alone to supply the substantial evidence required to justify the Board's factual conclusions. Although the Board's decision states that the Board was "persuaded by the report of the Board of Police and Fire Surgeons," the Board's decision also describes at greater length certain of Dr. Frey's detailed medical findings (to which the Board attributed an import substantially different from Dr. Frey's own opinion in judging Martin's disability under the statutory guidelines). We conclude, however, that a *Perales* analysis should govern the admissibility and weight of medical reports even when the Board does not rely solely upon a given document or set of documents for medical evidence adverse to the petitioner. We do so because medical reports purport to contain expert, scientific knowledge directly addressing central issues in a disability dispute. They are, therefore, particularly persuasive evidence in this context, and, when adverse, will inevitably prove highly prejudicial to a petitioner's cause. Because hearsay medical reports purport to employ high professional standards of expertise, we must hold them, for purposes of admissibility, to a higher standard of reliability than we do other hearsay evidence.[3]

This case also differs from *Perales* in that the Summary Medical Report ostensibly reflects the collective judgment of a panel of physicians who have examined Martin's medical records, whereas the re-

In *Perales*, therefore, the Supreme Court "came close to abolishing" the "residuum rule" of evidence in the federal courts. *Id.* at § 16:8; *see Jadallah v. District of Columbia Department of Employment Services*, 476 A.2d 671, 677, 678 n. 4 (D.C.1984) (Ferren, J., concurring). The residuum rule, which for years had been applied in most federal and state courts, *id.* at 677–78, precluded an administrative finding or conclusion based on hearsay unless "corroborated by some residuum of legally competent evidence—evidence that would be admissible in court." *Id.* at 677; *see Johnson v. United States*, 202 U.S.App.D.C. 187, 190, 628 F.2d 187, 190 (1980); *School Bd. of Broward County, Florida v. Department of Health, Education, & Welfare*, 525 F.2d 900, 905 (5th Cir.1976); 3 ADMINISTRATIVE LAW TREATISE at § 16:6; 3 E. CLEARY, McCORMICK ON EVIDENCE § 354 (3d ed. 1984). That rule is tending to give way in this court, as well as in the federal courts, to "a more flexible approach" focusing "on the 'truthfulness, reasonableness, and credibility' of each item of hearsay relied upon." *Jadallah*, 476 A.2d at 678 (Ferren, J.,

concurring) (quoting *Johnson*, 202 U.S.App.D.C. at 190–91, 628 F.2d at 190–91). "Although this flexible approach rejects any rigid threshold requirement of competent corroborating evidence, it nevertheless recognizes the potential shortcomings of relying on hearsay evidence," *id.*, and thus subjects administrative findings and conclusions based exclusively on hearsay to exacting scrutiny.

3. In reaching this conclusion, we acknowledge another reason to reject the "residuum rule." *See supra* note 1. Just as some hearsay testimony may be admissible despite the absence of a residuum of corroborating, legally competent evidence, under a "flexible approach," *Jadallah*, 476 A.2d at 678 (Ferren, J., concurring), we note—as this case illustrates—that other hearsay testimony may be held inadmissible even though consistent with evidence that is properly admitted. Residual, though weak competent evidence, does not automatically justify admissibility of related, though flimsy, hearsay.

ports in *Perales* were each the work of a single examining physician expressing his or her own judgment about a particular aspect of the claimant's health. Although we conclude that *Perales* governs the admissibility and weight justly accorded a document such as the Summary Medical Report, we do not believe that, to be admissible against a claimant at a disability hearing, an adverse medical report by a panel of doctors must always be drafted and signed by physicians who have personally examined the patient. The collective recommendation of a board of physicians helps to ensure the credibility and reliability of its conclusions, even though some or all members base their decisions on other doctors' reports of examinations of the patient. On the other hand, we also believe that when a medical report has been prepared and approved by physicians who have not examined the subject of the report, due process requires, for admissibility, that those who issue the report must demonstrate that their conclusions about the nature and degree of a petitioner's disability were based upon information provided by an examining doctor.

■ Applying *Perales* to the present case, we conclude that introduction of the Board of Surgeon's Summary Medical Report as evidence at Martin's hearing did not meet the demands of due process. Not one of those who prepared, voted upon, or signed the report had personally examined Martin; each of the doctors who had examined Martin, including Dr. Linehan, to whom the report refers, concluded Martin was disabled from performing limited duty with the police. The only indication in the report itself of medical evidence to the contrary was Dr. Linehan's reference to Martin's ability to use his hand as a "scoop," a characterization which, ironically, the Retirement Board itself found necessary to "negate" by reference to Dr. Frey's testimony. Moreover, the Board of Surgeons, in reaching its recommendation, relied in part on the Internal Affairs report which, as elaborated below, we conclude was afforded undue weight. It is true that Dr. Mitchell, a member of the Board of Surgeons who had examined Martin, had written a draft of the Report. But he was on leave when Martin's case came before the Board of Surgeons, and his draft was rejected or ignored in the preparation of the final report. When asked whether the Summary Medical Report was his report on Martin's condition, Dr. Mitchell clearly stated "No it is not," and when asked whether he was part of the committee that submitted the report, he stated that he was not. (Despite all this, Dr. Balkissoon purported to sign the report for Dr. Mitchell.)

In sum, the fatal defect in the Summary Medical Report is its conclusory character. The Report contains only one paragraph of medical analysis of Martin's condition. This paragraph consists of a substantial quotation from a report submitted by Dr. Linehan, who had examined Martin in 1984. But in the passages quoted, Dr. Linehan states in some detail his reasons for concluding that Martin *was* disabled from performing limited duty in the police force. The Report then states that, the Board of Surgeons having reviewed Martin's medical history and the Internal Affairs Report, "it was their decision that Sergeant Martin could perform light duty." That was all. In a document that purports to reflect the considered judgment of medical experts about a man's medical condition we see no medical findings or reasoning supporting the conclusion that Martin could perform limited duty. Such hearsay evidence so lacks the indicia of reliability enunciated in *Perales* that its use by the Board deprived Martin of due process of law.

## B.

Introduction of the Internal Affairs Report does not raise such acute questions of due process as did use of the Summary Medical Report, for the Internal Affairs Report did not purport to reflect an expert, technical evaluation of Martin's condition. Moreover, it reported, if indirectly, the statements of persons who claimed to have personally observed the events related in it. But, because hearsay presents special dangers to the accuracy of findings based on such evidence, our cases indicate that an administrative board must carefully exam-

ine the reliability of the hearsay it proposes to consider in order to determine how much weight the evidence may properly receive. Hearsay may constitute substantial evidence only when shown reliable and credible, *see, e.g., Simmons v. Police & Firefighters' Retirement & Relief Board,* 478 A.2d 1093, 1095 (D.C.1984), and, at least without clear indicia of reliability, "hearsay evidence alone should not be permitted to offset the sworn testimony of a witness...." *Jadallah,* 476 A.2d at 677 (Ferren, J., concurring). In the extreme case, hearsay may appear so unreliable that it is "of little, if any, probative value." *Id.* at 677.

On the premise that Sergeant Causey drafted the Internal Affairs Report, we note it contained evidence that for present purposes falls into three classes: Sergeant Causey's own observations; those of other police officers whose reports Sergeant Causey summarized in the Internal Affairs Report; and observations reported by Martin's neighbors to police officers and subsequently related to Sergeant Causey for his report. We have no difficulty with admission of the first class of observations, for the identity between the witness and the author of the report, together with Sergeant Causey's presence at the hearing for questioning, lent his observations significant indicia of reliability. While the other two classes of observations were technically admissible, their probative value is limited. The second class of observations comprised hearsay within hearsay, since Sergeant Causey summarized in his report what other witnesses had told him. The third class of observations arose from an even more problematic chain of communication. These observations were triple hearsay, originating with the neighbors interviewed, then passed to the interviewing officers, then to Sergeant Causey for his report to the Board. We have previously criticized the use of hearsay within hearsay as grounds for decision, for reliance upon such an "attenuated evidentiary chain" seriously compromises the trustworthiness of the final decision. *See Jadallah,* 476 A.2d at 677.

The weakness of such evidence is demonstrated by the allegations reported in the Internal Affairs Report, many of which are imprecise or unsure and, as a result, of only the most questionable probative value for the issue at stake: Martin's capacity for useful and efficient service in the police department. For example, officers who watched Martin performing with his band are said to have reported that he "extensively used his left hand," held the mike cord in his left hand with his thumb and index finger," "handled and closed up two brief case style containers using both hands," and "handled drinks." Since Martin has not claimed that his left hand is totally disabled from use, such statements, though clearly prejudicial in appearance, would require careful examination and honing to become trustworty gauges of Martin's ability to perform the rather different tasks characteristic of the police station. (There is no evidence that Martin has been offered a job to sing for the police department.)

The statements about Martin's domestic activities are even more questionable. One officer is said to have "observed a person whom he believed to be Sergeant Martin" pushing a mower across his front lawn; a neighbor is said to have seen Martin "cutting grass" while exhibiting no physical disabilities "to a casual observer." The Board learned nothing of why the officer thought it was Martin he saw, or of what it meant to the neighbor to say that one is "cutting grass," or of the circumstances under which these observations were made. At the disability hearing, Martin himself challenged the truth or meaning of many of the Report's assertions about his use of his left hand. The Board had no opportunity to test the bias or certainty of those whose statements Martin challenged. For these reasons, and in light of the legal standard we have established, we conclude that, except as to Sergeant Causey's own personal observations, the Board should not have placed much confidence in the Internal Affairs Report as a measure of Martin's disability for "useful and efficient service."

### C.

At the hearing, petitioner sought to introduce the draft summary medical report that Dr. Mitchell had prepared for the Board of Surgeons before going on leave and to examine Dr. Mitchell about the contents of this draft. Dr. Mitchell testified at the hearing that in his judgment Martin was disabled from useful and efficient service. Dr. Mitchell's draft reflected his opinion. Martin wanted to undermine the credibility of the Summary Medical Report by showing that the one member of the Board of Surgeons who had personally examined Martin differed with the Board of Surgeons' judgment on Martin's degree of disability and on the ultimate question of his ability to perform limited duty for the police department. The Board denied admission of the draft report and precluded Martin from questioning Dr. Mitchell about its contents.

Martin claims that the Board unjustly blocked his effort to impugn the credibility of the Summary Medical Report—itself hearsay that the Board admitted into evidence—with Dr. Mitchell's draft report. We agree. Indeed, when the reliability of the two hearsay documents is considered, Dr. Mitchell's draft would appear in two respects to have been the more reliable of the two reports, for it was prepared by a doctor who had examined the patients, *cf. Perales*, 402 U.S. at 402–03, 91 S.Ct. at 1427–28, and its author was present to answer questions regarding its contents. In these ways, Dr. Mitchell's draft report was like Sergeant Causey's own observations that we held admissible from the Internal Affairs Report. Moreover, the applicable statute and our cases make clear a strong preference for admitting relevant evidence, including reliable hearsay, at an administrative hearing. *See* D.C.Code § 1–1059(b) (1987 Replacement); *Thompson*, 451 A.2d at 1184; *Kopff*, 381 A.2d at 1385.

### IV.

We remand for the Board to determine whether Martin's disability prevents him from performing service that is "useful and efficient." The Board may hold a new hearing to allow additional evidence from the police department, the Board of Surgeons, or Martin. In any case, the Board should reach an independent judgment, based on the record evidence of Martin's physical capabilities, the department's needs, the work Martin has been given since his disability, and other tasks to which he could be assigned without pain or aggravation of his condition. Inherent in this analysis is consideration of the cost of continuing to employ Martin as a full-time sergeant.[4]

*So ordered.*

MACK, Associate Judge, concurring in part and concurring in the remand:

I join Judge Ferren's analysis of the inadmissibility of the Board of Surgeons Summary Medical Report, the limited probativeness of the Internal Affairs Report, and the admissibility of Mitchell's summary medical report. I concur in the disposition provided for in Part IV with respect to the remand to the extent that the Board should address the following issues and make specific findings and conclusions based on an analysis of the evidence: (1) whether Martin is capable of performing his limited duty position in light of his disability, and (2) whether Martin's service is "useful and efficient" in light of his work and department needs. My call for a remand is based on the inadequacy of the findings of fact and conclusions of law which accompany the Board's order.

As this court has recently noted:

Eligibility for disability retirement requires three showings: (1) disability (2) from useful and efficient service (3) in the grade or class of position last occupied. D.C.Code § 4–607(2) (1981). Implicit in those three requirements is a fourth: capacity to perform the work assigned given the nature of the injury or disability.

---

4. As I understand Judge Mack's concurring opinion, she agrees with the disposition in Part IV except for this last sentence.

*Szego v. Police and Firefighters' Retirement and Relief Board,* 528 A.2d 1233, 1235 (D.C.1987). The Board is responsible for making specific findings as to each of these requirements. D.C.Code § 1–1509(e) (1981); *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Commission,* 402 A.2d 36, 42 (D.C.1979). In the decision appealed from, the Board analyzed only the evidence of the extent of petitioner's disability. Despite the fact that petitioner presented evidence contesting the usefulness and efficiency of his job and demonstrating substantial pain in his left hand and wrist, the Board made no findings with respect to "usefulness and efficiency," nor did it analyze the impact of Martin's pain on his ability to perform the actual tasks he was assigned. Since the plain language of the statute requires that the service be "useful and efficient," and since our caselaw reasonably requires that a claimant be capable of performing the work, the Board's failure to address and resolve these issues was erroneous as a matter of law. D.C.Code § 1–1510(a)(3)(D) (1981).

Indeed, the Board delegated to the Board of Surgeons and the police department the full responsibility for determining whether Martin was physically capable of performing his limited duty position and whether those duties provided useful and efficient service. After summarizing the evidence of the extent of Martin's disability, the Board concluded:

> [T]he Board is persuaded by the report of the Board of Police and Fire Surgeons, dated August 12, 1985, and the Investigative Report of the Internal Affairs Division, D.C. Metropolitan Police Department, advising that it was the decision of the Board of Police and Fire Surgeons that petitioner can perform limited duty. Thus, he was returned to limited duty effective August 12, 1985. Therefore, the Board concludes that petitioner is able to perform useful and efficient service with the D.C. Metropolitan Police Department.

Exclusive reliance on the determinations of the police department and the Board of Surgeons that Martin was capable of performing limited duty was improper for a number of reasons. First, the Board of Surgeons Report was so unreliable as to be inadmissible. Even apart from that, however, since the Board of Surgeons and the department made their reports before Martin actually took limited duty, their conclusion that he could perform limited duty was made without knowledge of the actual tasks he would be required to perform. After their reports, Martin took limited duty and later re-petitioned for disability retirement. *See Wells v. Police and Firefighters' Retirement and Relief Board,* 459 A.2d 136, 139 n. 3 (D.C.1983) (en banc) ("[t]he presumption that a suitable light duty position exists can be rebutted either at the original hearing, or *later* if no position that the injured officer *can perform* is available in the grade or class he last occupied") (emphasis added). The Board's exclusive reliance, therefore, on Martin's *potential* capacity to perform limited duty, as reflected in the reports prepared before he took limited duty, was improper. At a minimum, the Board should have described the actual duties Martin was required to perform and made an independent determination of his capacity to perform those duties in light of his disability.

By like reasoning, the Board's conclusory finding that Martin's job was "useful and efficient" was unaccompanied by any analysis of the conflicting evidence. Since Martin had actually taken a limited duty position, a finding of its usefulness and efficiency should have been accompanied by an analysis of the tasks Martin performed and the department's need for those services.

It must be remembered that it is the Board, not the police department nor the Board of Surgeons, which must determine whether the requirements for disability retirement have been met. In my view, it would be unwise to allow the Board to neglect the normal requirement of specific findings by permitting it to conclusorily state, as it did, that there was "no disability for useful and efficient service." It is not this court's function to review all the

evidence before the Board and "fill in" the numerous blanks left by its decision.[1]

I am not suggesting that, on remand, the Board will be unable to conclude that Martin's job is useful and efficient and that Martin is capable of performing it. I am only suggesting that the Board must analyze the evidence presented and make specific findings and conclusions regarding each of the contested statutory requirements. My analysis of this case and its procedural defects in no way affronts the factually and procedurally distinct circumstances faced by this court in *Wells, supra,* where the claimant refused the limited duty position offered him.

ROGERS, Associate Judge, dissenting.

Martin seeks to retire on full disability,[1] and his burden is great. In reviewing the Board's decision for substantial evidence, this court must look to the entire record that was before the Board and, if the court finds there is substantial evidence to support the Board's findings, it must affirm regardless of its disagreement with the decision or its view of contrary evidence.[2] Because there is substantial evidence to support the Board's finding that Martin has failed to prove he is medically eligible for such retirement, and because there was no *evidence* from Martin that the police department had failed to fulfill its responsibilities, *Wells v. District of Columbia Police & Firefighters' Retirement and Relief Board,* 459 A.2d 136, 138–39 (D.C.1983) (en banc), neither this court nor the Board has grounds for straying from the definition of § 4–607(2), set forth in *Wells,* that "an officer is 'disabled' if he is unable to perform work in any position at the same salary level as he previously earned." *Id.* Accordingly, I respectfully dissent.

A.

First, the record demonstrates there was substantial evidence to support the Board's finding that Martin was not eligible for disability retirement under D.C.Code § 4–616 (1981).[3] Martin is currently appealing from the Board's third denial of his request for retirement on disability as a result of the injury to his left hand in 1979. The Report of the Police and Firefighters' Retirement and Relief Board states that Martin's first request was denied in 1982, and affirmed by this court on appeal, and his second request was denied in 1984 without a hearing since he presented no new basis for retirement, relying on the same diagnostic and recommendations as before. The Report reviews the occasion of Martin's 1979 injury, his initial surgery and the

---

1. The accuracy of the facts relied upon by the dissent to conclude both that Martin was physically capable of performing his assigned tasks and that his service was useful and efficient is unquestioned, *post* at 115–117, but the vast majority of those facts were never mentioned nor relied upon in the Board's decision. Moreover, conflicting facts were brought forth. It seems to me that the Board should resolve that conflicting evidence.

The dissent also suggests that under the circumstances of this case, "the Board could properly defer to the police department's determination that Martin's limited duty job provides useful and efficient service." *Post* at 117 (footnote omitted). Clearly, the dissent is correct in implying that the department's assessment of the usefulness and efficiency of the service it offers a partially disabled officer is entitled to great deference. In this case, however, the Board did not simply "defer." Rather, without regard to Martin's proffer, the Board permitted the department to make the statutory determination that Martin's job was useful and efficient.

1. Based on twenty years of service, Martin is eligible for optional retirement under D.C.Code section 4–618. Hence, one basis of Judge Ferren's reasoning for rejecting the government's arguments is based on an incorrect assumption. See opinion of Judge Ferren *supra,* at 106.

2. D.C.Code § 1–1510(a)(3)(E) (1981); *see, e.g., Dowd v. District of Columbia Police and Firefighter's Retirement and Relief Board,* 485 A.2d 212 (D.C.1984); *Seabolt v. District of Columbia Police and Firemen's Retirement and Relief Board,* 413 A.2d 908 (D.C.1980); *Liberty v. District of Columbia Police & Firemen's Retirement and Relief Board,* 410 A.2d 191 (D.C.1979).

3. The procedure by which a petitioner can meet his burden to establish that he is unable to perform "useful and efficient service" in any job in his category is set forth in *Wells, supra,* 459 A.2d at 138–39; *see also Szego v. District of Columbia Firefighters' Retirement and Relief Board,* 528 A.2d 1233, 1235 (D.C.1987) ("capacity to perform the work assigned given the nature of the injury or disability").

reports that followed by Dr. Frey and the Board of Police and Fire Surgeons, the latter concluding that Martin suffered a ten percent disability and recommending that he was permanently disabled for full duty. The report also summarizes the 1982 and 1984 proceedings, and refers specifically to the Board's findings and conclusions in 1982, and states in regard to the present disability request, that in 1985 the Report of the Board of Police and Fire Surgeons repeats its prior diagnosis of Martin, but viewed his percentage of disability as twenty percent.

With knowledge of this record and history, the Board's findings regarding Martin's third disability retirement request focused on Dr. Frey's testimony and his "demonstration at the hearing to negate Dr. Joseph C. Linehan's characterization ... giving the impression to a reader (one without benefit to [sic] Dr. Frey's explanation and demonstration of the useful manipulation of the hand, wrist and fingers) that the hand is like a small shovel or ladle, for dipping out things," and on the fact that the 1985 Internal Affairs Division (IAD) Report indicated "no change" in Martin's non-departmental activities "in which the left hand is used unrestrictedly and without apparent pain."

Viewed in this context, the significance of Martin's testimony at the hearing is clear. He did not deny that he is able to perform the limited duty tasks assigned to him by the police department. He testified that he could write and had processed investigative reports, interviewed applicants for vacancies, conducted roll calls, handled confidential funds, kept track of cruisers, signed leave slips, and was able to participate in a police investigation. Regarding the injury which was the basis for his claim of disability, he did not dispute the evidence that he could use his left hand for some purposes. He also admitted that he could perform most of the activities described in the IAD report, and, at most, took issue only with insignificant details.[4] In other words, although the Board of Surgeon's report stated that Martin's disability had increased, Martin did not testify that this resulted in his inability to do the job he was assigned.

The significance of the medical testimony supporting the Board's finding that Martin was able to perform limited-duty assignments is clear for similar reasons. The Board could reasonably view Dr. Frey as most knowledgeable of Martin's injury, and rely on his testimony regarding the precise nature of Martin's injury to his left hand[5] and his consequent, present capabilities and limitations as well as on Dr. Frey's final report in concluding that Martin could perform his limited-duty assignments. Martin at no time contended that any of the physicians on whose opinions the Board relied were incompetent to render an opinion on his disability or that a physician's expression of opinion, in the absence of having conducted a personal examination of Martin, was contrary to accepted standards of medical practice. See FED.R.EVID. 703. Nor did he make an effort to subpoena any of the doctors. Also, for reasons set forth below, the Board was entitled to rely on the summary medical report, as well as the IAD report, in reaching its decision.

Moreover, Martin did not establish the uselessness of his assigned limited duty services.[6] His concerns before the Board were the extent of his disability and his

---

4. For example, he conceded that he has the manual dexterity necessary to cut grass. The majority states, *supra* at 112, that the internal affairs report was unclear about the meaning of "cutting grass." Read in context, however, the statement was abundantly clear. The report stated that the witnesses did not want to sign their statements for fear that Martin would "mow" their lawns. In addition, there was eyewitness testimony that Martin ably handled a microphone during a musical performance, removing it from its stand and tossing it back and forth between his hands, and that he had also squeezed a woman's hand.

5. Because Martin was right-handed and the injury was to his left hand, medical evidence of his ability to use or not use his left hand as a scoop is, contrary to Judge Ferren's suggestion, see *supra* at 110, of diminished significance. See also *id.* at 105. The Board relied on Dr. Frey's testimony to establish that the hand was useful as more than a scoop.

6. The legislative history of the phrase "useful and efficient service" is, for purposes of this appeal, unhelpful. The phrase first appeared when Congress in 1957 amended the Policemen and Firemen's Retirement and Disability Act to

dissatisfaction with what he considered to be a low-status of limited duty assignments but he did not specifically challenge the actual utility to the department of his assignments. Rather, Martin's attorney suggested, during closing argument to the Board, that Martin averaged only one hour and nineteen minutes of work per week. Martin had in fact testified that, "I'm sure I've done other things," and that he had never actually added up all of the time he had spent on light duty assignments. He admitted that it was not unusual for there to be substantial periods of inactivity during police department investigations and the climax of an investigation, and that in the investigation to which he had been assigned, "[s]o far there just hasn't been a whole lot going on." Since Martin failed to shift the burden of coming forward with evidence, the Board could properly defer [7] to the police department's determination that Martin's limited duty job provides useful and efficient service. *Wells, supra,* 459 A.2d at 139.

**B.**

Second, the majority erroneously concludes that the Board was not entitled to

grant benefits similar to those in the civil service retirement system. *See* H.R.Rep. No. 530, S.Rep. 699, 103 Cong.Rec. 14323-340 (debates) concerning H.R. 6517, *enacted as,* Pub.L. No. 85-157, 71 Stat. 391, 85th Cong., 2d Sess. (Aug. 21, 1957). Apparently, the "useful and efficient service" language has been in the Civil Service Retirement Act since its adoption in 1920 without relevant legislative commentary. *See* congressional reports from 1920 (Pub.L. No. 66-215; H.R.Rep. Nos. 813, 942, S.Rep. Nos. 99, 270, 66th Cong., 2d Sess.), 1926 (Pub.L. No. 69-552; H.R.Rep. Nos. 768, 1099, S.Rep. No. 604, 69th Cong., 2d Sess.), and 1930 (Pub.L. No. 71-279; H.R.Rep. Nos. 784, 1549, S.Rep. No. 16, 71st Cong., 2d Sess.). Federal decisions interpreting the phrase comment that it is sufficient that the employee be unable "to perform useful and efficient service in the specific position which he occupies at the time application is made for his retirement," *Cerrano v. Fleishman,* 339 F.2d 929, 931 (2d Cir.1964), *cert. denied,* 382 U.S. 855, 86 S.Ct. 106, 15 L.Ed.2d 93 (1965), but the government, as opposed to the employee or the Civil Service Commission, can introduce evidence to satisfy its burden of proof that a suitable alternative position exists. *Parodi v. Merit Systems Protection Board,* 690 F.2d 731, 739 (9th Cir. 1982).

rely on the summary report or the IAD report. The summary medical report was sufficiently reliable under the factors listed in *Richardson v. Perales,* 402 U.S. 389, 402-06, 91 S.Ct. 1420, 1427-29, 28 L.Ed.2d 842 (1971); [8] *see also Dowd, supra* note 2, 485 A.2d at 215, because it was prepared by a panel of competent physicians and based on, *and accompanied by,* the reports of the examining physicians. The fact that the summary report was prepared by physicians serves to enhance reliability and is thus a factor in favor of admissibility.[9] The use of a one paragraph conclusion by the panel does not, of itself, undermine the validity of their findings. The majority also understates, contrary to *Perales, supra,* 402 U.S. at 404-05, 91 S.Ct. at 1428-29,[10] the importance of Martin's ability to subpoena witnesses as a means of cross-examining the preparing physicians and assailing the report.

The majority's reasoning regarding the IAD report is also unpersuasive. Martin had every opportunity to challenge the veracity of the statements contained in the report, but he responded primarily by ad-

7. It remains unclear to me what Judge Ferren would have the Board determine with respect to the fiscal prudence of a light duty assignment. *See, e.g.,* D.C.Code § 1-725 (1986 Supp.).

8. *Perales* only involved issues of substantiality (admissibility was conceded on appeal) and, because it affirmed that medical reports can constitute substantial evidence, the decision cannot serve as a precedent for denying the admissibility of those reports. A personal examination of the patient was only one of the factors identified by the Court as relevant in determining the reliability of hearsay evidence. *Id.* at 402-06, 91 S.Ct. at 1427-29.

9. "Courts have recognized the reliability and probative worth of written medical reports even in formal trials and, while acknowledging their hearsay character, have admitted them as an exception to the hearsay rule." *Perales, supra,* 402 U.S. at 405, 91 S.Ct. at 1429.

10. In *Perales,* the court commented that because the complainant did not take advantage of his opportunity to subpoena the reporting physicians, he "is to be precluded from now complaining that he was denied the rights of confrontation and cross-examination." 402 U.S. at 405, 91 S.Ct. at 1429.

mitting most of the allegations. "Thus having given up his opportunity to cross-examine the [contributors], he can scarcely be heard to say that the Board's findings rested on hearsay." *Dowd, supra* note 2, 485 A.2d at 216. Moreover, in view of Martin's testimony and other eyewitness testimony, any error by the Board in this regard was harmless. *Arthur v. District of Columbia Nurses' Examining Board,* 459 A.2d 141, 146 (D.C.1983).[11]

11. I agree with the majority that the Board unreasonably denied admission of the draft medical report prepared by Dr. Mitchell, but I conclude that since Dr. Mitchell testified in support of Martin's disability, the error was harmless.